In the Interest of K.F., A Child.

Appeal of K.F., Mother.

No. 88–628.

Supreme Court of Iowa.

March 22, 1989.

Bobbi M. Alpers, Davenport, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., and Charles K. Phillips, Asst. Atty. Gen., for appellee State of Iowa.

Gary D. McKenrick of Gomez, May, McKenrick & Kelly, Davenport, guardian ad litem for the child.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

This is an appeal from a juvenile court judgment severing a mother-child relationship.[1] The controversy brings into sharp focus the painful choices thrust upon the State as *parens patriae* when a natural parent suffers from a chronic mental illness. We transferred the case to the court of appeals which, on a five to one vote, reversed the juvenile court. Having granted applications by the State and the child's guardian ad litem for further review, we now vacate the court of appeals decision and affirm the judgment of the juvenile court.

1. Termination of the father-child relationship, ordered by the court on the ground of abandon-

I. Familiar principles guide our consideration of this appeal. Our review, of course, is de novo. *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981). Thus we examine the facts as well as the law and adjudicate rights anew on the record before us, mindful of our obligation to accord weight to the juvenile judge's factual findings, especially when considering the credibility of witnesses. *Id.*

As we recently explained in *In re A.C.*, 415 N.W.2d 609 (Iowa 1987),

> [c]entral to a determination of this nature are the best interests of the child. In this connection we look to the child's long range as well as immediate interest. Hence, we necessarily consider what the future likely holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.

*Id.* at 613 (quoting *In re T.D.C.*, 336 N.W.2d 738, 740–41 (Iowa 1983)).

The grounds for termination of parental rights must be shown by clear and convincing proof. Iowa Code § 232.116(5)(c); *In re O'Neal*, 303 N.W.2d 414, 422 (Iowa 1981). Of particular significance here is the rule that mental disability, standing alone, is not a sufficient reason for the termination of the parent-child relationship. *O'Neal*, 303 N.W.2d at 422. Nevertheless, we have said that it is a proper factor to consider and, when it contributes to a person's inability to parent, may be determinative on the issue of whether termination is required in the child's best interest. *See id.*

With these principles in mind, we turn to the record before us and the arguments presented on appeal.

II. The minor child, Kristi, was nine years old when the termination hearing was held. Her mother, appellant K.F. (Karen), suffers from schizophrenia, paranoid subtype. Since 1981, Karen has been

ment, has not been appealed.

subject to eleven involuntary commitments due to her mental illness. Thus Kristi has spent four and one-half years of her young life in out-of-home placements. The commitment which ultimately precipitated these proceedings occurred in December 1985. Kristi was placed in emergency foster care, followed by an adjudication that she was a child in need of assistance (CINA). *See* Iowa Code § 232.96. Pursuant to this adjudication, she has remained in foster care ever since.[2]

As revealed by the testimony of Karen's psychiatrist, her illness is characterized by bizarre behavior brought on by delusions of persecution and paranoia. In general, the illness manifests itself through abnormalities in the thinking process (associational disturbances), inappropriate affect (disassociation in physical manifestation of emotion), autism (total self-absorption), and habit deterioration (for example, neglect of personal hygiene). Characteristically, the illness follows a predictable pattern: the patient denies the illness, loses touch with reality ("decompensates"), becomes delusional, and then exhibits bizarre behavior resulting in an involuntary commitment. After a period of hospitalization and drug therapy, the patient regains a hold on reality, is eventually discharged from commitment and then, because of denial of the illness, discontinues necessary medication and begins the cycle anew.

Karen's illness has followed this pattern for fifteen years, with the additional feature that she falls within the subgroup of schizophrenics who become acutely ill (psychotic) within one to two weeks of stopping medication. In the acute phase, Karen's delusions center on her belief that she is being persecuted by Mafia figures; a preoccupation with injustices she has suffered; and a belief that she has ties to the White House and famous persons who direct her activities. Her manner becomes irrational and aggressive, punctuated by excessive profanity and anger. She has in recent years caused numerous disturbances in shopping malls and in the offices of prospective employers, threatening neighbors with arson, voicing intentions to shoot the President, and threatening to kill a minister.

When in remission, Karen presents herself as polite and congenial, a doting and affectionate parent, and a tidy homemaker. She maintains her own apartment and satisfactorily manages her social security disability income. She has rarely missed a scheduled visit with Kristi and she has cooperated with case workers in planning suitable activities for them.

In spite of this outward ability to carry on a normal life, Karen's psychiatrist concedes that even with the help of medication, Karen's delusional system "never goes away 100 percent." The truth of his observation is exemplified by Karen's response to a question posed by the court in a CINA review hearing held in August 1987, approximately six months prior to the termination hearing:

Q: Have you tried—since last February or so, have you tried to maintain regular contact with Kristi through letters, if you weren't available for visits in the community? A: Yes. And I'd like to explain, I was brainwashed down at Mt. Pleasant by pills that were brought in from Turkey, which you can communicate with each other in your mind, and this is already known fact in Japan and China. It's just that this—this country is not aware of it.

Six months later, discharged from any involuntary commitment status and defending her parental rights in these termination proceedings, Karen responded to a nearly identical inquiry as follows:

A: I once made a statement ... in one of my hearings that I was given drugs to more or less mind read, read my mind, and thoughts were being put in my head at that time, that the Mafia was after me. Since I've been out of the hospital in June, I no longer have the

---

2. Kristi has lived in three different foster homes since December 1985. Her most extended and satisfactory placement was discontinued when Karen learned of her whereabouts and began mailing the family disturbing letters. Kristi suffered considerable grief over the separation that followed. Since then, the location of Kristi's foster home has not been revealed to Karen.

drugs and no longer have the mind reading or mind interpretation, and I have no belief now that the Mafia is after me.

Q: Okay. You believe that was a result of the drugs that the doctors were giving you? A: Not necessarily. I was receptive to this mind reading thing because I was on drugs. Whoever wanted to read my mind had to take the drug, which I was told is from Turkey.

Q: Okay. And since you're no longer taking that drug, you can't read those minds now; is that—A: No, I couldn't mind read. They could mind read me.

Q: Okay. A: And put thoughts in my mind, so that I would appear crazy if I said anything. Now, that may sound delusional to you now, but it's real. I have no—I've had no problems with that since June, though.

It is against this backdrop that we consider the State's petition to terminate Karen's parental rights, filed December 9, 1987. Brought in accordance with Iowa Code section 232.116(5),[3] the burden rests upon the State to furnish clear and convincing proof that all of the following have occurred:

(1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

(2) The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months.

(3) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Iowa Code § 232.116(1)(e) (1987 Cum. Supp.).

Section 232.102 refers to potential harm to a child resulting from a variety of circumstances listed in section 232.2(6). In this case, the State's underlying CINA petition alleged that due to Karen's involuntary hospitalization, Kristi was without anyone to care for her. See Iowa Code § 232.2(6)(j) ("child in need of assistance"

means an unmarried child who is without a parent, guardian, or other custodian).

Karen concedes that conditions (1) and (2) of section 232.116(1)(e) have been met. Kristi has been adjudicated in need of assistance and custody has been transferred for more than twelve months. We therefore address solely the sufficiency of the proof offered in support of the third necessary element. In that connection, Karen challenges the termination on three grounds: (1) that the court erred in admitting hearsay evidence over her timely objection; (2) that the court's determination that Kristi cannot be returned to her mother pursuant to Iowa Code section 232.102 is not supported by clear and convincing evidence; and (3) in view of the bond between this mother and daughter, the trial court should not have terminated the parent-child relationship.

■ A. *Hearsay testimony.* Appellant's first contention merits only our brief attention. During the State's examination of Sharon Love, a social worker who had worked closely with Karen and Kristi, the State offered into evidence a quarterly report authored by Sharon's predecessor, Tammie Bayless. Sharon testified that she had relied on this report to familiarize herself with Kristi's case when she took it over in August 1987.

Counsel for Karen objected to the admissibility of the document on hearsay grounds, contending that Ms. Bayless was not present in court and could not be cross-examined about her credentials, bias, or the content or sources of her report. Ms. Bayless apparently missed the hearing due to illness, and the State offered to continue the hearing to procure her attendance. The court, noting the necessity of balancing the report's probative value against its possible prejudice, ruled the document admissible after concluding that it had been previously admitted as part of the underlying CINA proceeding and was thus already part of the record.

---

3. This section was renumbered as Iowa Code § 232.116(1)(e) by 1987 Iowa Acts ch. 159 § 6.

Further statutory references in this opinion are to the Code as amended.

The court's ruling was wholly consistent with the rule announced in *In re Adkins*, 298 N.W.2d 273, 277–78 (Iowa 1980) and our more recent decision in *In re E.J.R.*, 400 N.W.2d 531, 532 (Iowa 1987). In those cases we recognized that because of the interdependent nature of CINA and termination actions, evidence properly admissible in an adjudicatory proceeding should be accorded the same standard of admissibility in a subsequent hearing on termination pertaining to the same child. *E.J.R.*, 400 N.W.2d at 532. Accordingly, no basis for reversal can be sustained on this challenge.

■ B. *Sufficiency of the evidence.* The crucial question on this appeal is whether clear and convincing evidence exists in the record to support the termination. The court of appeals reversed the juvenile court on this ground. It focused on evidence of Karen's "steady improvement" as a result of bi-weekly intramuscular injections of Prolixin. It also characterized as inherently "unfair" the State's sudden movement toward termination now that the child has gained sufficient maturity to understand her mother's illness and, after four and one-half years of foster care, has patiently awaited reestablishment of their home. Moreover, the court concluded, the record did not provide the requisite proof that Karen would not in the future be capable of adequately ministering to her daughter's needs.

We would like to share the court of appeals' optimism about Karen and Kristi's future but our review of the record compels us to reach an opposite conclusion. The crucial question, as we see it, is not whether Karen's behavior while in remission convinces us that she is equal to the task of parenting Kristi. Were that the inquiry, our response—based on this record—would be cautiously optimistic. The decisive question, however, is whether Karen—if allowed to resume Kristi's care—would remain in remission and maintain a stable home for her, thus extinguishing the need for Kristi's continued CINA status. Our answer to that question, based on Karen's history and the prognosis of-

fered by her own psychiatrist, is unequivocally negative.

Karen's psychiatrist, Dr. Chang, testified that there are those who suffer from schizophrenia who can successfully control the disease and its symptoms. Such individuals typically have insight into their illness and understand the necessity of maintaining contact with their physician and taking prescribed medication. When these individuals feel the symptoms of schizophrenia surfacing, they will actually seek out their physician and voluntarily commit themselves for in-patient treatment, if necessary. Regrettably, Karen has never displayed this insight. She denies that she suffers from any illness and resents what she interprets as interference by others in her life. She seeks autonomy and freedom from medication, believing that her medication is the source, rather than the cure, for her difficulties. When free of medication, however, normal life stress precipitates her acute psychotic symptoms. As noted by the trial court, this has been the recurring theme over the past eight years.

In spite of his strong belief that mentally ill persons like Karen have a right *not* to have the legal ties to their children severed under any circumstances, Dr. Chang expressed a grave concern that Karen's current cooperation in treatment was motivated solely by her desire to regain custody. He predicted that if she achieved that result she would remove herself and Kristi from the community, discontinue her medication and quickly become psychotic and incapable of providing for her child's most basic needs. Other witnesses who have worked closely with Karen echoed this same concern based on corroborating statements made by Karen.

Faced with the inevitability of requiring Kristi to endure repeated CINA proceedings and foster placements, here or elsewhere, for the remaining years of her childhood, we must ask whether such a way of life can possibily serve her best interest. To her credit, Kristi has survived the upsets in her life thus far with remarkable resilience. Nevertheless, the emotional strain of establishing relationships with

multiple foster families, the unpredictability of her mother's behavior, and the obligation Kristi feels to provide Karen with emotional support, has already taken its toll. In the words of the clinical psychologist who evaluated Kristi in connection with these proceedings, Kristi is suffering from "considerable confusion, anxiety, and a lack of trust." Dr. Hutchison summarized his findings and recommendation as follows:

> Overall, Kristi's relationship with her mother is one of mixed feelings. There is love and caring along with fear and confusion. While she wants to retain a safe relationship with her mother, she also states that she would like to live with one family on a long term basis. She seems to be well aware that she cannot live with her mother and actually would not want to live with her.
>
> Based on this evaluation of Kristi, I would recommend that she be placed in a longterm, stable environment, either through longterm foster care or adoption. She needs the stability and security of knowing that she will not be moved from place to place so that she can allow herself to emotionally invest and receive from those around her.

As we consider the doctor's recommendation, we are confronted by a stern reality: termination of the parent-child relationship will not guarantee Kristi a permanent home. Nor can we overlook evidence that the termination itself will be stressful to Kristi. On balance, however, we concur in the juvenile court's judgment that termination "will provide the best opportunity for the security and permanence this child so desperately needs."

In summary, the State has proven by clear and convincing evidence that Kristi cannot be reunited with her mother now, or in the forseeable future, without subjecting her to the same harm that would justify adjudicating her a child in need of assistance. No intervention up to this point has altered the repetition of the cycle. Given the fact that Kristi has already spent nearly half her life in foster care, we must view these tragic circumstances "with a sense of urgency." *In re A.C.,* 415 N.W.2d at 614. We are convinced that termination is the only viable means by which Kristi can escape the cycle and relinquish her role as one of its victims.

■ C. *Statutory exception.* Finally, we briefly address Karen's contention that even if the evidence is deemed sufficient to support termination, we should not take that action because it would be "detrimental to the child ... due to the closeness of the parent-child relationship." *See* Iowa Code § 232.116(3)(c). This statutory exception requires proof by clear and convincing evidence to justify its application. *See id.; see also In re L.P.,* 370 N.W.2d 839, 842–43 (Iowa App.1985). Under this record, that standard cannot be met.

We note that all of the testimony and documentary evidence furnished by those persons who were acquainted with Karen and Kristi speak of an undeniable bond between them. The evidence also reveals, however, that the relationship is marked by as much ambivalence as affection. Because of Karen's unintentional but unrelenting preoccupation with persecutory delusions, and her tendency to "test out reality" on Kristi, an understandable distance has developed between them as Kristi attempts to physically and emotionally protect herself from Karen's often frightening behavior. As noted by Dr. Hutchison and others, Kristi's attitude toward her mother is a blend of love and fear, caring and confusion. In view of the paradoxical nature of the relationship, and the strength of the evidence otherwise supporting termination, we find no basis to set aside the juvenile court's judgment on this ground.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.