**In the Interest of M.L.O., D.O. and D.O., Children.**

**C.O., Mother, Appellant,**

v.

**STATE of Iowa, Appellee.**

**No. 91–45.**

Supreme Court of Iowa.

Nov. 20, 1991.

Cynthia Z. Taylor of Dwyer, Wing, Zamora, Taylor & Walters, Davenport, for appellant.

Bonnie J. Campbell, Atty. Gen., John M. Parmeter, Special Asst. Atty. Gen., and Judy Sheirbon, Asst. Atty. Gen., for applicant State.

Stephen W. Newport, Davenport, guardian ad litem for the children.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and SNELL, JJ.

HARRIS, Justice.

The district court concluded that the relationship between the fathers and the mother of three young children should be terminated. On our de novo review we are obliged to agree and we hence vacate a contrary decision of the court of appeals and affirm the judgment of the district court.

Even when plainly demanded by the facts, it is a fearful thing to order termi-

nation of a parent-child relationship. Heart-wrenching circumstances seem always to attend termination cases. The parents caught up in what can truly be described as tragedies obviously are faced with indescribable misfortune which, understandably, they ascribe to injustice. Children involved in termination cases, just as obviously, are faced with unmet fundamental needs. Under the clear mandate of Iowa's statutory scheme for termination, and our own cases defining it, our concern with the parent's tragedy must not be allowed to frustrate the needs of the children. Our paramount and overriding consideration, it has been said many times and ways over the course of a great many years, is the best interests of the children. *See, e.g., In re Griffin,* 210 N.W.2d 665, 667 (Iowa 1973) (termination, though too severe and cruel as punishment for any offense, must occur when in best interests of the child).

It is not true, as parents in termination proceedings are apt to allege, that the State, through its agencies, is somehow bent on seizing children of the underprivileged with a view to awarding them to persons who are more favorably circumstanced. The scheme is limited to the rescue of children found in intolerable circumstances, with a view to placing them in environments which can equip them for happy and productive lives. The General Assembly made a societal judgment that, at a given point, the tragic circumstances of the parents must yield to the crying needs of the children.

■ I. Our review of the juvenile court order terminating the parent-child relationship is de novo, which necessitates an independent evaluation of the record. *In re K.F.,* 437 N.W.2d 559, 560 (Iowa 1989). While we draw our own legal conclusions and factual findings from this evaluation, we do give weight to the juvenile court's factual findings. *Id.* This is especially true when our review requires the assessment of witness credibility. *Id.*

■ II. The facts here certainly qualify as tragic. Three boys are involved: M.L.O., born February 24, 1986; D.O., born October 24, 1987; and Ds.O., born November 11, 1988. The younger two have the same father. Neither father has appealed the termination order.

The family first became involved with the state agency, the Iowa department of human services, on July 28, 1988, after M.L.O. was the victim of sexual abuse. The perpetrator was G.T., the live-in paramour of the boy's mother. He is also the natural father of the two younger boys.

No blame for the incident attaches to the mother. There is no evidence of other sexual abuse, and the mother moved promptly to report the incident. On the other hand the mother cannot be said to select stable male partners. G.T. served a prison sentence for abusing M.L.O. And M.L.O.'s father was also in jail when the mother married him. As late as 1987, according to the record, he was serving a twenty-five year sentence for robbery and rape. The mother had never divorced him (she says for lack of funds) and they were said to remain in periodic contact.

Agency intervention began with high hopes; the earliest caseworker's records reflected guarded optimism that the mother might respond to efforts to expand her parenting skills and personal development. Services at first focused on: (1) sexual abuse treatment for M.L.O. and G.T.; (2) parental education and support for the mother and G.T.; and (3) marital therapy.

M.L.O. was adjudicated a child in need of assistance as defined by Iowa Code section 232.2(6)(d) (1987) on August 30, 1988. On August 23, 1989, D.O. and Ds.O. were, pursuant to stipulation, similarly adjudicated. This was a few weeks following Ds.O.'s birth. Ds.O. was born four to six weeks prematurely following the mother's use of cocaine. D.O. and Ds.O. are both asthmatic. Ds.O. has had two critical asthmatic attacks necessitating hospitalization. Ds.O. had other medical concerns which were attributed to his premature birth and perhaps his mother's use of cocaine.

M.L.O. and D.O. were originally placed in foster care on November 18, 1988. There were a number of attempted placements of

the two boys in their mother's home, with repeated returns to foster care. Since May of 1989, they remained in foster care or residential placement. Ds.O. was placed in foster care following his birth and has remained in foster care or residential placement ever since. The mother never showed consistent ability to supervise the boys. From time to time she seemed to commit herself to child care, but only briefly. She soon lapsed back into old patterns of neglect and indifference. The agency attempted an extensive trial period of intensive support for much longer than usually can be budgeted for families. The mother of course did much better when very intensive support was provided. But her ability and interest waned when the family preservation program ended, and the mother was called upon to meet the children's needs with routine (though less intensive) support from family-centered services and visiting nurses.

The department's Herculean efforts on behalf of the family did not reap the hoped-for improvement in the mother's ability to nurture the children. The department's initial optimism gradually dissipated, and at length it became apparent that the mother could not, or would not, develop even minimally adequate skills to cope with parental responsibilities.

An example of C.O.'s lack of skills occurred in May of 1989, when a concerned neighbor telephoned the agency. C.O. had entrusted her children to the neighbor, who understood the children's stay would be short. After caring for the children overnight the neighbor, unable to reach C.O., called the agency. The children were placed in foster care the following day. C.O., who was in Illinois, did not communicate with the agency about the children until more than a week had passed.

On a continuing basis the mother missed visitations arranged with the boys. The agency had provided, or attempted to provide, transportation, or picked up transportation applications for her visits. She would not cooperate. She would not fill out applications, or simply would not be there.

The mother lived a transient life. Attempts to secure appropriate housing, food, medication and proper health care were thwarted. A family life specialist stopped teaching sessions which had been arranged because the mother stopped attending.

A definite factor, though of controverted significance, has been the mother's health. She has suffered from an acute heart condition, dating from when she was fourteen years old. Her inattention to this condition, her refusal to take medicine or follow medical advice, though to a degree explained by a pervasive fear of death, was clearly established by the evidence. At the center of this appeal lie two opposing perceptions of the mother's long-time ignoring and flaunting of medical advice. The mother argues that it was her grave physical condition, not indolence or indifference to her boys, which caused them to be neglected. At the time of the termination hearing, prompted by a life-threatening episode with her heart, the mother at last relented in her steadfast refusal to address the problem and submitted to heart surgery. Prior to then the mother not only refused to submit to surgery but refused to cooperate with the doctors in taking medicine prescribed or furnished for her condition.

The result of the surgery was a dramatic improvement. Prior to surgery her overall heart function, measured as a percent of the blood the heart ejects given the amount with which it was filled, was nine percent. Fifty percent is considered normal. Following surgery the mother's function improved to thirty-two percent. At thirty-two percent she remained somewhat impaired, though her cardiologist believed she could resume nearly normal functions. And he thought her chances for further improvement were excellent.

The evidence presented by the agency recognized the mother's heart problem to be an impediment to her, but indicated it in no way justified the neglect of her children. We agree. The mother's neglect of the children cannot be explained by her heart condition. The agency did everything possible to help the mother develop parenting skills, accommodating her health problem

in these efforts. The efforts were spurned. The mother's inattention to her own health is particularly ominous in view of the delicate health of her two younger sons.

We agree with the district court in finding that the mother:

> has not significantly progressed according to the case plan, and after more than three years of intervention ... she has no better capabilities of parenting these children, or even understanding these children's needs and problems. Nor does the [mother] understand her obligations and responsibilities. Nor does the [mother] understand the effect her lifestyle has on her children.

> It appears ... that the risk of further ... abuse or neglect is high due to the fact that [the mother] recognizes neither the need for change nor is she motivated to change. . Due to the [mother's] failure to recognize or perceive the problems these children have or the need for change, the [mother's] ability to rectify the situation is severely impeded....

We agree with the district court that requirements for termination were satisfied in accordance with Iowa Code sections 232.116(1)(e) and 232.116(1)(g) (1989). The record unmistakably shows that the mother has not been able to maintain even a semblance of a home for her two older boys. The youngest boy has never lived with her. As with others we have observed in past cases, these children cannot wait to grow up. It would be irresponsible to compel them, now well placed and with prospects for bright futures, to spend their remaining formative years with their mother.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.