# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-1962
Filed January 28, 2026

————————————

**In the Interest of J.E., Minor Child,**

**J.E., Mother,**
Appellant.

**J.J., Father,**
Appellant.

————————————

Appeal from the Iowa District Court for Story County,
The Honorable Hunter W. Thorpe, Judge.

————————————

**AFFIRMED ON BOTH APPEALS**

————————————

Daniela Matasovic (until withdrawal), Ames, and Leah Patton of Patton Legal Services, LLC, Ames, attorneys for appellant mother.

Jim Thornton of Thornton & Coy, PLLC, Ankeny, attorney for appellant father.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, attorneys for appellee State.

Shannon M. Leighty, Nevada, attorney and guardian ad litem for minor child.

————————————

1

Considered without oral argument
by Tabor, C.J., and Schumacher and Sandy, JJ.
Opinion by Schumacher, J.

**SCHUMACHER, Judge.**

Parents separately appeal the termination of their parental rights to their child, born in 2021. We, like the district court, conclude that an additional extension of time for reunification efforts is unwarranted, termination is in the child's best interests, and a permissive exception should not be applied to preclude termination. Accordingly, we affirm on both appeals.

## BACKGROUND FACTS & PROCEEDINGS

The mother has a long history of mental-health concerns and substance use, including methamphetamine. This family most recently came to the attention of the Iowa Department of Health and Human Services in November 2023,[1] upon reports of the mother driving erratically and appearing in public without clothing. A department caseworker attempted to meet with her, but the mother denied the concerns and did not allow the caseworker into her home. Later that day, the maternal grandmother found the mother and the child in the mother's home. The mother was highly intoxicated and unresponsive. J.E. was in his crib, unattended. The mother consented to the child's removal and adjudication. The child was placed with the maternal grandparents, and the mother entered inpatient treatment.

The father did not have contact with the child due to a five-year no-contact order in place between him, the mother, and the child, stemming from the father's prior domestic abuse assault against the mother. The mother stated that her recent alcohol relapse had been triggered by

---

[1] A prior child-in-need-of-assistance case was opened in October 2021, shortly after the child's birth, due to concerns about the mother's substance use and mental health. The child was placed with the maternal grandparents upon removal, but he was eventually returned to the mother's custody. That case closed in November 2022.

remembering the abuse by the father because she wanted to "numb the pain." The court entered a dispositional order in January 2024, noting it was "concerning that court involvement was necessary after the previous case closed, [but] the Mother is making strides in putting herself in a place to resume care of the child."

The court's next order was entered in March, in which the court noted that "things have not been trending in the right direction." Several weeks after completing inpatient treatment, the mother was arrested and charged with operating while intoxicated, second offense. The mother also tested positive for methamphetamine. She was incarcerated on a probation violation.

The mother "substantially completed" inpatient treatment in May, but providers reported she needed more assistance for her mental health. At the next hearing, the court noted the mother "appeared to be dazed" and "somewhat confused as to what was going on." Meanwhile, the father reported he was depressed because he lost his employment due to arriving late for shifts. He relapsed on methamphetamine and went to jail for violating his probation. The court found continued removal was necessary "due to concerns about ongoing methamphetamine use" by the parents and the father's no-contact order.

The court entered a permanency order in October. Although the mother had tested positive for methamphetamine again in September, the court noted that she "continues to be heavily involved in [J.E.'s] life" and "sees him almost every day." The court agreed with the department's recommendation to continue to give the parents time to work toward reunification but noted, "The parties are reminded that this time is short and the most needs to be made of it."

The court's January 2025 order noted the mother had transitioned to semi-supervised visits and the department was hopeful she could move to unsupervised visitation soon. The court commended the mother on her "excellent progress" and noted "[i]t is imperative that the Mother continues to make sobriety a priority." The court noted "if she continues on this path reunification will occur," but it was "dependent on the choices [she] makes."

Custody of the child was returned to the mother in April.[2] Such was short lived, as approximately one month later, the department learned the mother "was acting erratically" and had left the child home alone while she wandered outside naked with only a shawl. J.E. was found playing outside alone several hours later. The mother reported she felt overwhelmed, she "needed a break," and "like she was walking in two worlds." Caseworkers learned the mother—who has a diagnosis of schizoaffective disorder bipolar type—had stopped taking her prescribed mental-health medications. The mother reported that she had tapered off her medication with the help of her medication provider. However, the mother's provider disputed this, stating she had not recommended the mother to taper off her medication. Indeed, the provider opined the mother "needs an antipsychotic medication" and the recent incident of the mother "leaving [J.E.] was due to dangerously stopping her medications against professional advice." The mother was hospitalized and again consented to the child's removal.

In August, the court entered an order directing the State to initiate termination proceedings. The court declined the parents' request for additional time to work toward reunification, finding:

[2] The mother's current probation officer, who supervises "high-risk cases," began supervising her case that month. The mother is on probation following burglary and operating-while-intoxicated convictions, with a potential discharge date in 2027.

While progress has been made in this case, the court cannot find that an additional six months would likely put the Mother in a position where the need for removal would no longer exist. [J.E.] has been removed from his parents' care for more of his life than not. The Mother's mental health struggles have been an issue the whole case and by her testimony for over 20 years. The court reluctantly finds the evidence does not support an extension for the Mother. Similarly, the child has not been seen by the Father in over two years and a [no-contact order (NCO)] remains in place. This NCO is not set to terminate until 2028. The evidence shows the Father could not resume care of [J.E.] in the next six months.

Shortly thereafter, the mother filed a motion to drop the no-contact order. The caseworker learned that the mother messaged the father that she believed he had "changed" and between the two of them they could fight for their rights to the child. The no-contact order was modified to allow electronic communication between the parents.

The termination hearing was held over two days in October. The parents requested additional time to work toward reunification. The department and guardian ad litem recommended termination of parental rights. The court entered an order terminating the mother's parental rights pursuant to Iowa Code section 232.116(1)(f) and (k) (2025) and the father's parental rights pursuant to section 232.116(1)(f) and (*l*). The parents separately appeal.

## STANDARD OF REVIEW

We review de novo the termination of parental rights. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). We give weight to, but are not bound by, the district court's fact findings. *Id.*

# ANALYSIS

In our review, we use a three-step analysis: first, determine if a ground for termination exists under Iowa Code section 232.116 paragraph (1); next, apply the best-interests framework from paragraph (2); and last, consider if any exceptions from paragraph (3) apply to preclude termination. *Id.* at 472–73. Because neither parent challenges the existence of the grounds for termination, we need not discuss this step. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

## I.    Six-month Extension

Both parents claim that if granted a six-month extension, grounds for termination would no longer exist. To grant an extension of time for reunification, the court must "enumerate the specific factors, conditions, or expected behavioral changes" providing a basis to determine the child will be able to return to the parent at the end of the additional six months. Iowa Code § 232.104(2)(b).

The initial permanency hearing took place in October 2024, during which the court granted a six-month extension. The court reiterated the parents needed to make "the most" out of the additional time. The parents had ten months between that hearing and the termination hearing to show the necessary progress to be reunited with the child. They failed to do so.

At the termination hearing in August 2025, a six-month extension was again requested. On this question, the court stated:

> As with the permanency hearing, the record lacks support showing an extension would put the Mother in a place where the need for removal would no longer be present if the court granted an extension. The child has already been removed from the care of [the parents] for 12 months in this case. When looked at in light of the Mother's progress, it is highly unlikely the need for removal will not exist in six months at which point the child will

have been removed for approximately 2.5 years. The Mother's history indicates additional time would likely put the court in a position where it is deferring this decision all while depriving the children of a permanent and safe home. It is simply not in the child's best interest to continue to wait for [the mother] in the hope that she will be able to provide a safe home for [J.E.] in six months. . . . The court finds that an extension pursuant to Iowa Code section 232.104 is not an appropriate outcome in this case.

For the father, a six month extension would require a nearly miracle level feat of rebuilding a relationship, maintaining sobriety, all while managing his unique work schedule. Here, it is not in [J.E.]'s best interest to see if [the father] can make all of these things. Accordingly, the court declines to grant a six month extension. A father coming into the picture late in the game must prove that an extension is warranted at termination. . . . Here, he has not done so.

On this record, we concur that the court had no basis on which to grant an extension. The mother had not demonstrated the ability to maintain her mental health, sobriety, or employment. The father maintained he had been sober since February 2025, but he acknowledged he had "not been part of [the child's] life . . . since 2022." And the father had not made himself available for even the first steps of involvement in this case. An extension of time was not warranted for either parent.

## II.    Best Interests

Termination also must serve the child's best interests. *See id.* § 232.116(2). The mother claims termination is not in the child's best interests due to the close bond she shares with him.[3] The mother also points out that the child has "four half-siblings on the mother's side"[4] and the

---

[3] The mother relies on her bond with the child as support for both her best-interests and permissive-exception-to-termination claims. Because she identifies statutory support for each claim, we address them separately.

[4] Those children are older and live primarily with their father.

maternal grandparents—who have cared for the child most of his young life—are no longer a permanency option.[5] The father claims termination is not in the child's best interests because "it is substantially likely that J.E. could be returned to [his] care within . . . six months."

In assessing the best interests of the child, we must look at his long-range as well as immediate interests. *See In re K.F.*, 437 N.W.2d 559, 560 (Iowa 1989). "This requires considering what the future holds for the child if returned to the parents." *In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997). Here, the court found:

> In the case at hand, the child ha[s] been out of [the mother]'s care for a little over for over half his life. In that time, [the mother] made significant progress particularly in the area of substance abuse treatment. It was noted by a provider that her mental health is a barrier for further substance abuse treatment and is likely a barrier to long term sobriety. These struggles date back to [the mother]'s teen years and her testimony shows and action displays a disconnect. On one hand, [the mother] acknowledges the importance of mental health and boundaries. On the other, she decides to unilaterally change her medication resulting in a crisis. The Mother's decision to change her medication uprooted [ J.E.]'s life yet again. The court has little confidence that this would not occur again if parental rights were kept intact. The child deserves a permanent home free from disruptions and that is something [the mother] has been unable to provide for him.

> The Father at this time has no relationship with the child due to the NCO being in place until shortly before the termination hearing. [ J.E.] has not seen his Father in almost 3 years. The court cannot find that starting a relationship with his father essentially from scratch would be in the child's best interest especially given the statutory analysis above. When looking at both the short-term and long-term interest of [ J.E.], the record is clear [the father] is unable to provide the type of care the child deserves.

---

[5] As the caseworker reported, the grandparents' decision was "mainly prompted" by the mother making allegations of sexual abuse—which were not confirmed—against the grandfather.

Here, the placement is no longer willing to be an adoptive placement. The Department has begun looking into adoptive homes and one has been found. Should termination occur, Department believes this home would be suitable and [J.E.] would have little trouble being adopted. Based on the forgoing, the court finds that it is in the child's best interest to terminate the parental rights of [the parents]. This will put [J.E.] in a place of stability that he has largely been denied his whole life.

Upon our review, we concur with the court's determination that termination is in the child's best interests.

## III.    Permissive Exception to Termination

Once the State has proven grounds for termination, the burden shifts to the parent to prove a permissive exception under section 232.116(3). *A.S.*, 906 N.W.2d at 475–76. As noted, the mother claims the closeness of the parent-child bond should prompt the court to apply an exception to termination. *See* Iowa Code § 232.116(3)(c). The mother described the parent-child relationship as "Sacred. Beautiful. Unbreakable." The guardian ad litem acknowledged that J.E. enjoys spending time with the mother and "[c]learly" the mother loves the child but opined "at this point in looking at [J.E.] and what's best for him, termination is in his best interests."

Application of the exception under paragraph (c) "requires clear and convincing evidence that 'termination would be detrimental to the child at the time due to the closeness of the parent-child relationship.'" *In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021) (quoting Iowa Code § 232.116(3)(c)). Under these facts and circumstances, the mother has not established that termination of her parental rights will be detrimental to the child.

We affirm the termination of parental rights.

**AFFIRMED ON BOTH APPEALS.**