STATE OF IOWA ex rel. CARL B. PARKS, Chief Probation Officer (in interest of TAMMY LYNN FORD, minor)

JOANN FORD HARTER, appellant, v. STATE OF IOWA, appellee.

No. 52256.

(Reported in 149 N.W.2d 827)

APRIL 4, 1967.

Jesse, LeTourneau & Johnston, of Des Moines, for appellant.

Ray A. Fenton, Polk County Attorney, and Michael E. Hansen, Assistant County Attorney, for appellee.

STUART, J.—The Polk County juvenile authorities instituted these proceedings under chapter 232, Code of Iowa, as amended by the Sixty-first General Assembly, seeking to sever and terminate the parent-child relationship between Joann Ford Harter and Tammy Lynn Ford, her daughter. The juvenile court found Mrs. Harter was unfit to retain the custody of her child because of her low mentality, mistreatment of the child and her immoral conduct. The parent-child relationship was severed and the child's custody was retained by the court for the purpose of placing her in a foster home or approving a permanent adoption. The mother claims there is not sufficient competent evidence to support the trial court's findings.

I. She claims the evidence in the record consists of hearsay, secondary hearsay, exhibits without proper authentication, opinions of unqualified witnesses and secondary evidence. This claim must be examined according to the burden of proof and rules of evidence applicable to this type of hearing. Section 232.46, Code of Iowa 1966, provides: "The court's finding with respect to grounds for termination shall be based upon a preponderance of evidence under the rules applicable to the trial of civil cases, provided that relevant and material information of any nature including that contained in reports, studies, or examinations may be admitted and relied upon to the extent of its probative value. When information contained in a report,

study, or examination is admitted in evidence, the person making such a report, study, or examination shall be subject to both direct and cross-examination when reasonably available."

Therefore, evidence, which under the ordinary rules of evidence applicable to a civil trial would be excluded as hearsay, lacking a proper foundation, improper opinion evidence, or not the best evidence, is admissible in such proceedings and the nature of the evidence is to be considered as it affects its probative value rather than its admissibility. In re Yardley, 260 Iowa 259, 149 N.W.2d 162.

Our review is de novo. In re Morrison Children, 259 Iowa 301, 306, 144 N.W.2d 97, 100; In re Yardley, supra. We will review all the evidence giving it the probative force it naturally possesses and giving weight to the fact findings of the trial court, especially when considering the credibility of witnesses. In re Morrison and In re Yardley, both supra.

We do not consider this approach to be much of a departure from a regular equity case in which evidence is admitted subject to objection and the courts are to sift out the admissible evidence. Here appellant's objections will be considered in relation to the weight to be given the evidence rather than its admissibility.

II. The juvenile court folders for Tammy Lynn Ford and her mother, Joann Brisbois Ford Harter, were admitted into evidence over the hearsay objection. They had been identified by Pauline Ramsey, deputy probation officer, as official case history records. She testified she made the entries appearing in these exhibits. Appellee stated both in its brief and oral argument that copies of these exhibits were made available to counsel for the mother two months prior to the hearing. This was not denied.

For the most part the exhibits are notations by the probation officer recording her day-to-day contacts with this mother and child over a period of years. They are of particular value in tracing the sociological history of the parties which is an important factor to be considered in cases of this kind, for a determination in custody matters "is necessarily based on what is likely to occur in the future because of present conditions and because of what has occurred in the past." In re Morrison Chil-

dren, supra. Such entries have much probative force as Mrs. Ramsey was on the stand subject to cross-examination and appellant did not take issue with her when she testified in her own behalf.

Other entries recorded reports received by the probation officer or the welfare worker from third parties as to appellant's treatment of the child or her own conduct which, if true, would be damaging to appellant. This type of hearsay is unreliable. "Hearsay, opinion, gossip, bias, prejudice, trends of hostile neighborhood feeling, the hopes and fears of social workers, are all sources of error and have no more place in Children's Courts than in any other court." (Citations) People v. Lewis, 260 N. Y. 171, 178, 183 N.E. 353, 355, 86 A. L. R. 1001.

The language in In re Matter of Hill, 78 Cal. App. 23, 27, 247 P. 591, 592, which related to information conveyed secretly to a judge is equally appropriate here:

"And so, while the exact truth should be searched out and all mere technicalities of procedure as distinguished from rules which protect substantial rights should be disregarded, the regular processes of the law provided to produce evidence, and the ordinary rules established to aid courts in testing and weighing it are not scrapped because the proceeding is a summary one.

"In the instant case the process of the law was available to bring witnesses into court, and it should have been used for that purpose. If persons secretly informed the judge that the parents' home was not a fit place for this child, and if their information was reliable and of any value, these persons must have known facts which would warrant that conclusion. It was their duty to come forward and in a manly or womanly fashion give their testimony, so that this helpless infant might be withdrawn from danger and cruelty. But details whispered privately to a judge in chambers cannot be basis of a final order. The more serious the accusation the greater the need that it be carefully tested, and to that end that no one interested be denied the right of cross-examination."

If a petitioner felt the information received from such third person was essential to the hearing, that person should have been

produced and subjected to cross-examination. A trial court should not and we will not give any weight to such hearsay.

Included in these juvenile folders are copies of a report from a school psychologist on an I.Q. test given the appellant in 1958 and the report of a psychiatric examination given her in 1965. These reports are classified as hearsay because there is no opportunity to cross-examine the one making the report, not because of any inherent unreliability. Sections 232.46 and 232.52 give appellant the right to subpoena anyone making such report for either direct or cross-examination at the county's expense. She did not exercise this right or show such witness was unavailable. We have no hesitancy in giving probative value to such reports under the rules set forth in section 232.46.

State's exhibit 5 is the "Psychiatric chart on Joann Harter from Polk County Broadlawns General Hospital". The exhibit was identified by Helen Malloy, chief social worker at Broadlawns. She testified the chart was under her care, custody and control and that it was her duty to make sure the entries were entered correctly. The chart included a psychological examination, reports of a social worker and reports of psychiatric examinations by Dr. Sidney Sands including the one also appearing in the juvenile folder referred to above.

The reports of the social worker are primarily based on information obtained from third persons or are opinions and conclusions of the witness based thereon. We do not believe they have any probative value and have given them no consideration. The reports of the psychological and psychiatric examination were of probative value for the reasons stated above. Appellant could have called the witnesses for cross-examination or shown they were unavailable.

Appellant now claims Doctor Sands' reports are inadmissible under the doctor-patient privilege. This privilege was not claimed below on exhibit 5 and is therefore deemed to have been waived. State v. Koenig, 240 Iowa 592, 36 N.W.2d 765, 766; Shepherd v. McGinnis, 257 Iowa 35, 131 N.W.2d 475, 482; 58 Am. Jur., Witnesses, section 446.

Petitioner claims the legislature by section 232.46 has provided that the doctor-patient privilege found in section 622.10 does not apply to juvenile proceedings. While there is force to this argument, we do not decide this issue here.

■ Exhibit 7 is the medical record for Tammy Lynn Ford from Polk County Broadlawns General Hospital. It was so identified by Marion Stocke, medical librarian secretary, who testified the medical records were under her care, custody and control and that it was her duty to make sure the entries were correct. The identification was sufficient to give the records probative value. History which purports to recite how the injuries to Tammy occurred has been disregarded as lacking probative value.

■ III. We shall now summarize facts as we find them to be established by evidence having probative value as discussed above.

Joann Brisbois Ford Harter was born in 1942. By the time she was 16 she had been adjudged delinquent by the Polk County Juvenile Court for truancy. Psychological tests administered at that time revealed an IQ of about 65. She was permitted to quit school with a recommendation she take part in a vocational rehabilitation program. About this time her mother died and for two years she lived part time with her maternal grandmother and part time with her stepfather, who had remarried and whom she did not like. She did not get a steady job or take an interest in vocational rehabilitation.

In June 1960 she married Franklin Ford without permission. He had had juvenile problems and was a convicted felon. Their first child was a boy. Shirley Long testified of an incident when she was living with Joann and her husband in Joann's grandmother's home when Joann got mad at Frank and took her baby off the bed, slapped him back and forth across the face and threw him from the doorway to the davenport. He was subsequently taken from his parents because of their abuse and neglect and placed out for permanent adoption.

In April 1962 while Joann still had custody of this baby, she was examined by a psychologist and a psychiatrist at Broad-

lawns. As a result of the psychological tests, Floy W. Mathews, chief psychologist concluded:

"She would appear to feel in strong conflict with her environment and to have some oppositional tendencies. The possibility of some schizoid development is suggested.

"One of this patient's primary problems is her borderline or mildly deficient intellectual function. There is a further problem in emotional development; test findings would be consistent with a diagnosis of inadequate personality."

She returned for further examination in August 1962, at which time she was pregnant with Tammy Lynn. Doctor Sands stated:

"In discussion of her problem she minimizes her own role in her difficulties and feels that the complaints of her grandmother are based upon misunderstanding. She claims she wishes to keep her baby and eventually live with it independently of her grandmother. Her limited intelligence does not permit her to see where she has exercised poor judgment in the past nor can she recognize the limitations that are present regarding her ability to care for herself and a child. There appears little to be gained from continued hospitalization on the psychiatric service and it is felt that this is largely a casework problem for Polk County Welfare. We will arrange for her to be seen by the Obstetrical Service for prenatal care but it is hoped that Polk County Welfare can arrange for supervision so that the patient will receive regular medical attention in preparation for the coming birth of this child. It is further our opinion that in view of her limited mental capacity and general social situation that she be referred to the Eugenics Board for consideration for sterilization."

Tammy Lynn was born December 8, 1962. She was taken to Broadlawns Hospital by juvenile authorities in November 1963 and a petition to terminate parental rights was filed November 15, 1963, at which time her father was again in Anamosa. In January 1964 the father's parental rights were terminated and Joann's rights were continued. Tammy was placed in the temporary custody of Mrs. Monohan, Joann's maternal grandmother with whom Joann was living.

The record is not clear when Joann divorced Ford, but in April 1964 she married Jerry Harter. They acquired a separate apartment and took Tammy to live with them. The situation looked hopeful for awhile, but did not last long. The marriage became a series of quarrels and separations with no established home. When separated from her husband, Joann and Tammy lived with Joann's sisters Janet and Judy, her grandmother and a friend Shirley Long. At the time of trial she was not divorced.

In March 1965 Joann was again examined at Broadlawns by Doctor Sands on information filed by her sister Janet Craig. At that time Doctor Sands summarized his findings as follows:

"The patient's interval history was reviewed and the patient was seen before the staff. As usual she has adjusted well to the hospital routine and as usual she minimizes her problem and sees no reason for her to be in the hospital. The general clinical picture is essentially that which has been seen here on other occasions and it is apparent she has no desire for any professional help. I continue to feel that this girl should not be responsible for the care of children by virtue of her limited intellectual capacity and emotional instability. I have in the past recommended sterilization and I would continue to do so; but there appears to be little interest on the part of the patient, her family or other agencies in bringing this about."

After Joann left the hospital she returned to the apartment rented by Shirley Long. Tammy had been left in her care while Joann was hospitalized. On May 28, 1965, according to the testimony of Shirley Long, Joann became angry because Mrs. Long would not go out on a date with her. Tammy was on the bed in the bedroom. Mrs. Long testified Joann said:

" 'I told you to get the F out of here', and she pushed the baby off the bed and the baby fell on the floor.

"And she kicked the baby and then she picked the baby up and she had her hanging by one arm and she had ahold of the baby's arm and it was hanging and she was beating the baby in the face with her fist and she took her out of the bedroom on out the frontroom and threw her out the front door.

"I went out and brought the baby in and she was bleeding and I wiped her face off and Joann came at me and told me to leave the little SOB out there and I told her to get away from her, that she wasn't going to beat the baby like that in my home, and she says, 'Well, I will kill her'.

"So I says, 'Well, you just go ahead,' and she was fighting at me and pulled the baby from me and I had three of my own around me that was screaming and crying and I picked up the phone and called the policeman."

The police came. One officer observed: "an abrasion on the upper right forehead and an abrasion below the right eye and on the right elbow and bruise marks and numerous minor bruises and abrasions about the child's neck and body." The mother seemed unconcerned and stated the child fell and that she would take her to the hospital that night.

The police took the child to the hospital and she has been in the custody of the State since that time.

There is other evidence of mistreatment and evidence Joann was dating other men while still married and stayed with them in her bedroom overnight. It is significant that neither of her sisters testified in her behalf although she lived with them part of the time in question.

We have no difficulty in concluding under this record that appellant was not a fit and proper person to have the care and custody of Tammy Lynn Ford and that the parent-child relationship existing between appellant and Tammy Lynn was properly severed.

IV. Appellant claims the juvenile folders, exhibits 3 and 4, do not meet the requirements of the social investigation called for by section 232.14 as they were not made after the "allegations have been established at a hearing". We interpret this portion of section 232.14 to be particularly applicable to a charge of delinquency. There, a hearing could establish delinquency by facts unconnected with the "social history and present condition of the child and family". There would be no need to investigate this aspect of the case unless the child were first determined to be delinquent. On the other hand, a deter-

mination that a child is dependent or neglected necessarily depends upon the "social history and present condition of the child and family". Such information must be available before an action to sever the relationship of parent and child can be considered. We hold this particular requirement of section 232.14 is not applicable to the proceedings to terminate a parent-child relationship. See sections 232.40 and 232.41.

V. Appellant claims the hearing on this cause violated the Federal and State Constitutions.

Her first brief point states it is an infringement of a fundamental constitutional right to deprive a fit and proper parent of the custody of a child if the child has not been abandoned or custody voluntarily relinquished. As we have heretofore determined that appellant is not a fit and proper person to have custody of this child, we need not consider this brief point.

Appellant also claims she was not in a position to defend this action because the petition did not set forth "facts which bring the child within the purview of this chapter" as required by section 232.3(1) and that she was not apprised of what the testimony against her was going to be. We hold this claim to be without merit for three reasons. (1) We interpret the "facts" referred to in section 232.3(1) to be ultimate facts not evidentiary facts. The petition does state the ultimate facts relied on. (2) If the petition did not satisfy the requirements of the section, it should have been attacked directly by a motion to dismiss or a motion for more specific statement. (3) Appellant was furnished copies of the juvenile folders two months before hearing and was advised of the nature of the evidence to be presented against her.

Appellant claims she was not afforded the indispensable elements of due process of a tribunal with jurisdiction, notice of hearing to a proper party, and opportunity for a fair hearing according to applicable procedures. Her claim of lack of jurisdiction is based on the alleged insufficiency of the pleading. We have already disposed of that claim. The statutes provide for notice. Section 232.45. There is no evidence the provision was not complied with.

616

 Appellant claims she was denied a fair hearing in violation of her constitutional right to due process of law. Cases are cited which hold the particular procedure involved therein violated a party's constitutional rights. In re Godden, 158 Neb. 246, 63 N.W.2d 151, 156; In re Mantell, 157 Neb. 900, 62 N.W.2d 308, 311, 43 A. L. R.2d 1122; State ex rel. Palagi v. Freeman, 81 Mont. 132, 262 P. 168, 171, 172; Kent v. United States, 383 U. S. 541, 86 S. Ct. 1045, 16 L. Ed.2d 84. In each case there were elements of due process missing which were afforded appellant here.

"The right to a hearing or an opportunity to be heard within the requirement of the due process clause ordinarily includes the right of a party to be present, during the taking of testimony or evidence, and to appear or be represented by counsel. Such right also includes the opportunity to know the claims of his opponent, hear evidence introduced against him, cross-examine witnesses, introduce evidence in his own behalf, and present proper argument as to law and fact." 16A C. J. S. 824, 825, Constitutional Law, section 622.

Appellant was given counsel of her choice at county expense. The juvenile folders were made available to him a reasonable time before hearing. She was present at the hearing. Her counsel cross-examined the witnesses presented and introduced evidence on her behalf. Arguments were made.

Sections 232.6, 232.46 and 232.52 afforded her the right and opportunity to subpoena any witness she desired to examine or cross-examine. This right was not exercised.

Her complaint narrows down to the claim she was denied a fair hearing because the decision was based on exhibits and testimony which would have been excluded under ordinary rules of evidence. This is an indirect attack upon the procedure set forth in section 232.46. The legislature can alter the customary rules of evidence as long as such change does not violate any fundamental rights. For example see sections 622.4 and 622.5 (dead man statute). Section 144.48 (birth, death or marriage certificates) Beardsley v. Ostrander, 254 Iowa 356, 359, 118 N.W. 2d 61.

We find nothing unconstitutional in the evidentiary rules set forth in section 232.46. The provisions of chapter 232 seek

to retain the advantages of an informal hearing in juvenile court while providing safeguards which will guarantee each party his or her fundamental rights to a fair hearing. We do not believe under this record that appellant was denied the opportunity for a fair hearing and in fact received one.

Appeal of Dattilo, 136 Conn. 488, 494, 72 A.2d 50, 53, involved a similar statute which made reports of investigations admissible. The court said: "The persons who made the investigations can be called as witnesses before the Superior Court, there to testify as to the facts they ascertained; the application of the rule saves time, trouble and expense in the disposition of the case, and at the same time protects the rights of the child and of interested parties by the provision that they may require any investigator whose report is before the court personally to appear and subject himself to cross-examination. * * * While we have found no case directly involving records of investigations of this nature, there is an increasing tendency to broaden the field of the admissibility of such reports. 5 Wigmore, Evidence (3d Ed.) p. 699 [and other citations]."

In In re Holmes, 379 Pa. 599, 606, 109 A.2d 523, 526, the court considered the objection that hearsay was introduced in a juvenile hearing. The court said: "Moreover, from the very nature of the hearings in the Juvenile Court it cannot be required that strict rules of evidence should be applied as they properly would be in the trial of cases in the criminal court. Although, of course, a finding of delinquency must be based on sufficient competent evidence, the hearing in the Juvenile Court may, in order to accomplish the purposes for which juvenile court legislation is designed, avoid many of the legalistic features of the rules of evidence customarily applicable to other judicial hearings. Even from a purely technical standpoint hearsay evidence, if it is admitted without objection and is relevant and material to the issue, is to be given its natural probative effect and may be received as direct evidence." (Citations) See Jenkins v. Jenkins, 304 Mass. 248, 23 N.E.2d 405, 407.

This case is therefore—Affirmed.

All JUSTICES concur except THORNTON, J., not sitting.