**In re the Interest of Baby Boy SCARLETT, a child, Appellee.**

**STATE of Iowa, Appellee,**

v.

**Doris Ethel SCARLETT, Appellant.**

No. 2–57223.

Supreme Court of Iowa.

June 25, 1975.

Oscar E. Jones, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., Michael P. Murphy and Lorna Lawhead Williams, Asst. Attys. Gen., for appellee, State of Iowa.

James W. Hughes, Des Moines, for appellee, Baby Boy Scarlett.

Heard before MOORE, C. J., and RAWLINGS, LeGRAND, REYNOLDSON and UHLENHOPP, JJ.

LeGRAND, Justice.

This appeal arises out of a hearing under Chapter 232, The Code, which resulted in terminating the parent-child relationship existing between Doris Ethel Scarlett, hereafter called Doris, and her son, who is designated in these proceedings as Baby Boy Scarlett. His true name is Jeremy John Scarlett. We refer to him hereafter as Jeremy. In terminating Doris' parental rights, the trial court directed that "said child [Jeremy] be and remain in the custody of the court for the purpose of transfer of his legal custody and guardianship of his person to suitable persons in accordance with § 232.48 of the 1973 Code of Iowa." We affirm the trial court.

Cases involving the severance of parent's right to children are invariably steeped in both drama and trauma. This is even more lamentably true in the present matter because it was apparent even before Jeremy was born that his mother's chances to keep and rear her child were in jeopardy.

Doris was 12 years old when she became pregnant and 13 when her son was born. The father of the child has never been identified. Both before and during her pregnancy, Doris herself was under the custody of the juvenile court of Polk County following a determination she was a delinquent child. She remained in that status through all of the proceedings which we are now reviewing.

Shortly after Jeremy's birth, he was found to be a dependent and neglected child within the provisions of § 232.2. No appeal was taken from this determination, which we therefore accept as a verity for present purposes.

Three months later a petition was filed by the Polk County Director of Court Services asking that the parent-child relationship between Doris and Jeremy be terminated.

This petition came on for hearing on October 8, 1973. Voluminous testimony was taken. Doris was represented by counsel; Jeremy's interests were protected by a guardian ad litem. On December 27, 1973, the trial court ordered the parental rights of Doris terminated.

The court's determination was based on § 232.41, subds. 2(d) and 2(e), The Code, which we here set out:

"The court may upon petition terminate the relationship between parent and child:

(1) * * *

(2) If the court finds that one or more of the following conditions exist:

(a) * * *

(b) * * *

(c) * * *

(d) That the parents are unfit by reasons of * * * or other conduct found by the court likely to be detrimental to the

physical or mental health or morals of the child.

(e) That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination."

This appeal raises two issues for review. Doris alleges the trial court erred in receiving testimony "which had no probative value." She insists, too, that the evidence was insufficient to warrant terminating her parental rights to her son.

■ Our review is de novo; the controlling consideration is the best interest of the child; the petitioner has the burden of establishing facts justifying the termination by a preponderance of the evidence. In the Interest of Kester Children, 228 N.W.2d 107, 109 (Iowa 1975); In the Interest of Wardle, 207 N.W.2d 554, 556–557 (Iowa 1973); § 232.46, The Code, 1973.

I. We consider first the objection to the reception of certain evidence.

Doris states the court erroneously considered reports and staff evaluations from various social agencies containing hearsay when the makers of the reports were not available for cross-examination. She also objects that the testimony of Mrs. Dell, a social worker, taken subject to objection, was improperly received.

■ In equity cases objections to testimony are ordinarily not ruled on, and all evidence is received subject to the objections so that the entire record may be available to the reviewing court on appeal. In re the Marriage of Erickson, 228 N.W.2d 57, 59 (Iowa 1975).

As to the merits of the objections, we believe the matter is controlled by the following portion of § 232.46, The Code, 1973:

" * * * Relevant and material information of any nature including that contained in reports, studies or examinations, may be admitted and relied upon to the extent of its probative value. When in-

formation contained in a report, study, or examination is admitted in evidence, the person making such report, study or examination shall be subject to both direct and cross-examination when reasonably available."

■ This statute justifies the admission of the reports and evaluations in question. Doris claims she was not afforded an opportunity to cross-examine the persons responsible for them. Before she can avail of this argument, she must show an unsuccessful effort to secure the attendance of the desired witnesses and a timely request to the court that they be produced. No such showing was made. In the Interest of Delaney, 185 N.W.2d 726, 732, 733 (Iowa 1971); In the Interest of Meyer, 204 N.W.2d 625, 627 (Iowa 1973).

■ Doris also objects because the reports contain much information of no probative value. We agree this is true, but the statute permits the use of such reports "to the extent of [their] probative value." In the Interest of Delaney, supra, 185 N.W.2d at 732; In Re Yardley, et al., 260 Iowa 259, 266, 149 N.W.2d 162, 167 (1967); Harter v. State, 260 Iowa 605, 609, 610, 149 N.W.2d 827, 829, 834 (1967). Even disregarding the evidence having no probative effect, which we have done, there is ample testimony to support the conclusions reached.

With reference to the testimony of Mrs. Dell, Doris objects, first, because she was permitted to express an opinion concerning the advisability of placing Jeremy in the home with Doris and her family; and, second, she says Mrs. Dell gave prejudicial hearsay testimony regarding the conduct of Doris' brother, David.

■ We agree the testimony concerning David was hearsay and was of minimal, if any, probative value. We have disregarded it. See In the Interest of Osborn, 220 N.W.2d 632, 634 (Iowa 1974).

■ We believe Mrs. Dell was properly allowed to express her opinion concerning where Jeremy should live. The objection

raised goes to the credibility, rather than the admissibility, of the testimony.

■ II. This brings us to the more serious issue which Doris raises—that the evidence is insufficient to justify a termination of her parental rights to Jeremy.

When, as here, our review is de novo, we give weight to the findings of the trial court, even though we are not bound by them. Rule 344(f)(7), Rules of Civil Procedure. That rule is of particular significance in the present case because the juvenile court conducted a number of hearings involving Doris' own status as well as that of Jeremy. The judge consequently had a better than usual opportunity to observe and appraise Doris and to form a considered judgment concerning her ability to rear Jeremy.

The finding that Doris herself was a delinquent child was based on a number of factors including her practice of glue sniffing, smoking marijuana, and a course of sexual promiscuity begun when she was 11 years old. The court found she was completely out of the control of her parents. Her mother, Helen, was herself only 28 years old and her stepfather only 26. They exercised little, if any, discipline over Doris, not because they didn't try but because Doris was defiant of any effort to restrict her personal freedom.

When first found to be delinquent, Doris was placed in the home of a cousin in Ottumwa. This placement did not work out. By then it was learned she was pregnant and she was put in the Hillcrest Home in Dubuque to await the birth of her child. While some of the testimony indicates she was cooperative and at times seemed intent upon working out her problems, these interludes were always interrupted by incidents of insubordination, contempt for authority, fighting and other manifestations of immaturity.

After Jeremy's birth and almost immediate adjudication as a neglected child, Doris was allowed to return home while Jeremy stayed on at Hillcrest Home. Doris' conduct during this period is the subject of some dispute and uncertainty.

Both Doris and her mother sincerely want this child. In an effort to show Doris should be allowed to have her son, her mother was less than forthright and honest in the information she gave about her daughter's behavior. For some time, she insisted to the social worker that Doris had changed; that she was now obedient, cooperative and helpful around the house; that she had attained a great measure of maturity; and that her sense of responsibility had been immeasurably enhanced with the birth of her child.

This story, however, collapsed when Mrs. Dell, the social worker, happened upon the scene immediately after Doris and her mother had had a serious quarrel. The mother then unburdened herself to the effect that Doris had not changed, that she still stayed out late virtually every night (sometimes all night), that she refused to bear any share of the burden around the house, and that she remained insubordinate and defiant of authority. Later Doris' mother sought to recant this condemnation of her daughter but, taken together with the other testimony, we believe this version has a ring of authenticity about it.

There was a great deal of evidence from a number of witnesses, including social workers, doctors, and probation officers, all indicating that Doris, despite her sincere affection and love for her son, is totally unsuited and unprepared to have the responsibility of his care. All those who worked on this case expressed the same opinion: Doris should not have her child. Some did so reluctantly, but nevertheless each ultimately found Jeremy's best interests required that Doris' rights as a parent be terminated.

Against that is the testimony of Doris, her mother, and her grandmother that somehow things would be better if Doris had her son. There is nothing in the record to justify this optimistic view. Doris, of

course, should not be deprived of her child except upon a showing that his best interests demand that action. Doubts are usually resolved in favor of the parent, and we have examined the whole record, including the transcript of testimony, with that in mind. It makes little difference that the child might be raised under standards different from those of the juvenile judge or ours. However, we refuse to take Jeremy from his present happy and well-adjusted environment and subject him to the serious risks which the evidence clearly establishes would be present if he were to be committed to his mother's care.

While we express great compassion for Doris, who finds herself experiencing emotional stress not intended for a child of her age, and while we commend her for her steadfast desire to have her son, the fact remains these are not premises upon which our decision can rest. We do not take a child from a mother to punish her nor do we give a child to a mother to reward her. We are obliged to make such disposition of the child as we find by a preponderance of the evidence is for the child's best interests.

By the very nature of things, much of the evidence is prognostic. However, we need not await the happening of tragic events to protect Jeremy.

We recognized this in In the Interest of Kester Children, supra, 228 N.W.2d at 110 where we said:

"A termination proceeding is not like a personal injury action where an injury must be proved before damages may be recovered. The termination statute is preventive as well as remedial. The statute mandates action to prevent probable harm to children and does not require delay until after the harm has been done."

See also In the Interest of Yardley, supra, 260 Iowa at 265, 149 N.W.2d at 166; In the Interest of Freund, 216 N.W.2d 366, 369 (Iowa 1974); In Re H, 206 N.W.2d 871, 874 (N.D.1973).

Under the record before us, the conclusion is inescapable that the trial court was correct in terminating the parent-child relationship existing between Doris and Jeremy.

Someday, perhaps, Doris may mature into a well-adjusted stable person who will be a good parent. But Jeremy is already two; his needs are now.

He can wait no longer for his mother to grow up.

III. We have carefully reviewed the issues raised and find nothing to justify reversing the trial court.

The judgment is accordingly

Affirmed.