**IN THE COURT OF APPEALS OF IOWA**

No. 20-0654
Filed July 22, 2020

**IN THE INTEREST OF A.H., E.S., D.A., B.A., and M.A.,**
**Minor Children,**

**A.A., Father of D.A., B.A., and M.A.,**
        Appellant,

**H.A., Mother of A.H., E.S., B.A., and M.A.,**
        Appellant.
_____

        Appeal from the Iowa District Court for Winnebago County, Karen Kaufman

Salic, District Associate Judge.

        A father appeals the termination of his parental rights to three children, and

a mother separately appeals the termination of her parental rights to four children,

all of the same sibling group. **AFFIRMED ON BOTH APPEALS.**

        Philip Leo Garland, Garner, for appellant father.

        Theodore J. Hovda, Garner, for appellant mother.

        Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant

Attorney General, for appellee State.

        Jane M. Wright, Forest City, attorney and guardian ad litem for minor

children.


        Considered by Vaitheswaran, P.J., Greer, J., and Blane, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2020).

**BLANE, Senior Judge.**

There are five children in the sibling group in this appeal.[1]  H.A. (mother) and A.A. (father) together are the parents of B.A. and M.A.  H.A. is also the mother of A.H. and E.S.[2]  And A.A. is also the father of D.A.[3]  After two child-in-need-of-assistance (CINA) proceedings spanning six years, the juvenile court terminated the parents' rights, pursuant to Iowa Code section 232.116(1)(f) and (*l*) (2020), for all five children.  The parents appeal separately.

## I.  FACTS AND BACKGROUND PROCEEDINGS

The Iowa Department of Human Services (DHS) originally became involved with this family in 2014, when it removed the children from the parents' home due to the parents' substance abuse, relationship and mental-health issues, and the unsafe condition of their house.  That case was resolved and closed in 2016.

Then, in December 2018, police executed a search warrant on the family home and discovered methamphetamine and marijuana.  They also found the house in an unsanitary condition again.  DHS initiated a second round of CINA cases.  The children were found to be in need of assistance in January 2019.  Although the children were not immediately removed, issues soon arose—DHS found out the parents were frequently leaving the children with relatives for extended periods of time, and the children were missing too many days of school.  The juvenile court ordered the parents to begin substance-abuse and mental-

---

[1] The family consists of the parents, A.H. (fourteen), E.S. (twelve), D.A. (twelve), B.A. (nine), and M.A. (seven).  The mother also has an adult daughter from another relationship.
[2] Their father is not a party in this appeal.
[3] His mother is not a party in this appeal.

health services, but they made little progress toward the case goals during this time.

Then, in February 2019, the court removed the children for the final time when the parents left them with relatives and disappeared for a week. In DHS custody, the children moved between three different relative and foster home placements. In spring 2019, three of the children were placed with one set of foster parents; the two other children were placed with a different foster family. The children remained in those placements through the rest of the CINA and termination-of-parental-rights (TPR) proceedings.

In the year following the children's removal, the parents made little progress in the case goals, continuing long-standing problems with substance abuse, housing instability, and unemployment.

As a starting point, the parents have never completed substance-abuse treatment; they have each participated in multiple evaluations but have not followed through with treatment recommendations. The father had evaluations in February and June 2019 and again in January 2020. After the June evaluation, he started treatment services but was discharged within thirty days for nonattendance. He tested positive for methamphetamine in February 2020, after the State filed TPR petitions.

Similarly, the mother discharged unsuccessfully from two different treatment programs due to nonattendance. She took twenty drug tests over the year of the CINA case—half were positive for illegal substances. Most recently, she tested positive for methamphetamine in January and February 2020. At the termination hearing, the mother testified that she had been sober since December

2019.  When confronted with the results of the February test, she stated, "I never got those results," and "I have not used, I have not been around anybody that's using, and so I don't have an explanation."

Notably, the parents began addressing their substance-abuse issues with more urgency at the beginning of 2020, when they both began participating in treatment services with the same counselor.  But they attended group sessions only sporadically.  At the termination hearing, they complained they were unable to follow through with treatment because their counselor went on medical leave and because of closures caused by the novel coronavirus or COVID-19 pandemic response.

But the juvenile court did not accept their explanation; it reasoned they could have identified another counselor at the same facility and services were being provided in other ways during the COVID-19 pandemic, which the parents chose not to pursue.  The mother did testify she was able to have a telephone therapy session with a different counselor on the day before the termination hearing.

Inadequate housing has also been a significant factor in the family's life. When the children were removed in February 2019, the family home was in a state of extreme disrepair.  The house had no utilities and was running on only well water and a generator.  The parents stayed in that home until February 2020, when they moved into a house vacated by the mother's parents.  The grandparents moved into a new house but continued paying rent for the parents to stay in their vacated house.  The grandparents also paid all utilities on the house because the mother and father are unable to get utilities in their own name due to past unpaid bills. The parents are supposed to pay rent and utilities to the grandparents but have

not yet done so.  In a verbal confrontation shortly before the termination hearing, the grandparents suggested they were considering evicting the father because he was not working to contribute to the household or paying rent.

The family's housing instability is also connected to the parents' unemployment.  Throughout most of the CINA case, they were unemployed.  The father testified to working off and on, but he was fired from his job in early 2019 and relatedly charged with third-degree theft.  Shortly before the termination hearing, both parents got new jobs—the mother began working at a fast food restaurant.  The father testified he began a construction job.  But at the time of the termination hearing, both workplaces had suspended operations due to the COVID-19 pandemic.  It was unclear when their employment would resume.

The mother testified the rent and utilities on their home are $800 each month and, when working, she is paid between $800 and $1000 per month.  It is unclear how much the father is paid.  It is also unclear how the parents will stretch their limited resources to cover rent, utilities, and all other expenses to care for five children without continued financial support from the grandparents.

The court held the hearing on the termination of parental rights on April 3.  Previously, it ordered that hearing be conducted entirely by telephone, pursuant to supervisory orders from the supreme court on the provision of court services during the COVID-19 pandemic.  The parents moved to continue until all parties and counsel could be personally present for a hearing.  The court denied the motion.  Following a fully telephonic hearing, the court terminated the parents' rights,

pursuant to Iowa Code section 232.116(1), paragraphs (f)[4] and (*l*).[5]  The court cited

the parents' ongoing substance-abuse issues—as demonstrated by recent drug

tests positive for methamphetamine—as well as their employment and housing

instability.  The parents appeal separately.

## II.  SCOPE OF REVIEW

We review child-welfare proceedings de novo.  *In re M.W.*, 876 N.W.2d 212,

219 (Iowa 2016).  The juvenile court's fact findings do not bind us, but we give

them weight, particularly with regard to credibility.  *Id.*  Our primary concern is the

best interests of the children.  *In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019).

Review of the parents' constitutional claim is also de novo.  *In re C.M.*, 652

N.W.2d 204, 209 (Iowa Ct. App. 2002).  And we review the juvenile court's denial

of a motion to continue for an abuse of discretion.  *In re M.D.*, 921 N.W.2d 229,

---

[4] Termination under paragraph (f) requires the following findings:
> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

[5] Termination under paragraph (*l*) requires the following findings:
> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96 and custody has been transferred from the child's parents for placement pursuant to section 232.102.
> (2) The parent has a severe substance-related disorder and presents a danger to self or others as evidenced by prior acts.
> (3) There is clear and convincing evidence that the parent's prognosis indicates that the child will not be able to be returned to the custody of the parent within a reasonable period of time considering the child's age and need for a permanent home.

232 (Iowa 2018). "A court abuses its discretion when 'the decision is grounded on reasons that are clearly untenable or unreasonable,' such as 'when it is based on an erroneous application of the law.'" *Id.* (quoting *In re A.M.*, 856 N.W.2d 365, 370 (Iowa 2014)).

## III. ANALYSIS

Neither parent challenges the statutory grounds for termination of their rights. Instead, they jointly raise the following issues: first, they contend termination of their parental rights was not in the children's best interests; and second, they contend the juvenile court erred in denying their joint motion to continue because the resulting termination hearing via teleconferencing violated their due process rights. The mother separately contends termination is detrimental to the children due to her close parent-child relationship. We start with the constitutional claim.

### A. Due Process Challenge

The parents challenge the termination hearing on due process grounds. Due process protections "include procedural safeguards for people who face state action that threatens a protected liberty or property interest." *Id.*. "Once the law finds a protected interest to exist, the question turns to what process or procedure the law must provide the person." *Id.* The questions here are whether the telephonic hearing satisfied the parents' due process rights under these circumstances and whether the district court abused its discretion in denying the parents' motion to continue.

The State filed a petition for termination of parental rights on January 30, 2020. The juvenile court originally set the hearing for February 21. Shortly

beforehand, the State moved to continue because it had not been able to serve A.H. and E.S.'s father. The State applied to give notice by publication. The court granted the continuance and publication request, resetting the termination hearing for March 6. On March 6, the court continued the hearing again because it determined the time initially allotted for the hearing was insufficient. The court reset the hearing for April 3.

On March 14, the chief justice of the Iowa Supreme Court issued a supplemental supervisory order "in response to the spread of the novel coronavirus/COVID-19 . . . to keep the courts open to the fullest possible extent while protecting public safety."[6] Iowa Supreme Ct. Supervisory Order, *In the Matter of Ongoing Preparation for Coronavirus/COVID-19 Impact on Court Services* (Mar. 14, 2020). The order continued most criminal and civil jury trials and proceedings but noted "motions to continue shall be freely granted where they would not result in unfair prejudice to a party." *Id.* at ¶13. With respect to juvenile cases, the order specifically instructed, "Non-delinquency juvenile matters may go forward as scheduled. With the approval of the court, hearings may be conducted with the parties and/or participants appearing remotely using video or phone conferencing."[7] *Id.* at ¶14.

---

[6] The novel coronavirus/COVID-19 is an ongoing international pandemic. To stem the spread, governments, including the state of Iowa, implemented emergency safeguards recommended by such agencies as the Center for Disease Control, which included social distancing and wearing of face masks. In Iowa, many businesses were ordered closed, people were encouraged to maintain six-foot distances between one another, and gatherings of ten or more people were discouraged.

[7] The supreme court clarified delinquency proceedings would be subject to the criminal proceeding directives "that by the[ir] nature would apply to juvenile delinquency cases." Iowa Supreme Ct. Supervisory Order, *In the Matter of*

In an updated supervisory order dated March 17, the supreme court directed, "Non-delinquency juvenile matters set to commence before May 4 shall be either continued to a date no earlier than May 4 or conducted with the parties and/or participants appearing remotely using video or phone conferencing, at the discretion of the court."  Iowa Supreme Ct. Supervisory Order, *In the Matter of Ongoing Provisions for Coronavirus/COVID-19 Impact on Court Services* ¶17 (Mar. 17, 2020).  On March 23, and pursuant to the supervisory orders, the juvenile court ordered that the upcoming termination hearing would be conducted by teleconference at the same date and time previously ordered.[8]

On April 2, the day before the termination hearing, the supreme court issued another supervisory order superseding all prior supervisory orders.  For juvenile cases, it instructed, "Non-delinquency juvenile matters set to commence before June 15 shall be either continued to a date no earlier than June 15 or conducted with the parties and/or participants appearing remotely using video or phone conferencing at the discretion of the court."  Iowa Supreme Ct. Supervisory Order, *In the Matter of Ongoing Provisions for Coronavirus/COVID-19 Impact on Court Services* ¶29 (Apr. 2, 2020).

The same day, counsel for both parents filed a joint motion to continue stating, "Both counsel are concerned about due process and the right of confrontation."  Both attorneys' offices were closed to clients, "[c]omplicating their

---

*Ongoing Preparation for Coronavirus/COVID-19 Impact on Court Services* ¶15 (Mar. 14, 2020).

[8] The court gave detailed instructions on how each participant was to dial into the teleconference and how to proceed if a party did not have access to a telephone. It also encouraged counsel and clients to communicate before the hearing.

ability to ask questions when witnesses are testifying and adequately representing their clients." They asked the juvenile court to continue the hearing until "restrictions on live hearings are lifted." The court denied the motion based on the following considerations: "It does not appear that the Supreme Court restrictions will be lessened any time soon and continued delay of this matter is not in the best interest[s] of the children."

At the commencement of the teleconference termination hearing, counsel renewed their motion saying,

> [W]e object to the fashion for this type of case. . . . [The supreme court has] also said that there will be no jury trials until this matter [coronavirus] gets done, and we feel that this is equally as important to a jury trial and that the confrontation is important in this type of case.

The court admitted these are "not ideal circumstances" but the supreme court had extended the suspension of criminal and civil proceedings in the previous day's order, which also "confirm[ed] that the court does have discretion to determine whether or not a hearing is appropriate to be held by teleconference."

The court further expressed its impression that the supreme court supervisory orders "expect us to conduct as much of the court system as possible in taking into account the specific issues that relate to termination and CINA proceedings, that there is an urgency to those, and, . . . a component . . . about what's in the best interests of the children."The court also noted its intention to break after each witness's examination and allow attorneys and clients to disconnect and discuss privately before resuming the hearing. The court concluded, "[W]hile . . . it's certainly not ideal, the best interests of the children in

determining what the long-term outcome is going to be for them requires that we proceed today through the teleconference."

On appeal, the parents contend the court's denial of their motions violated their due process rights, including the right to be present and the right to confront witnesses.[9]

"When assessing a procedural due process claim, we must first determine if there is a protected liberty or property interest at stake." *In re T.S.*, 868 N.W.2d 425, 432 (Iowa Ct. App. 2015). "[T]ermination-of-parental-rights proceeding[s] clearly involve[] a parent's fundamental interest in the care, custody, and control of his or her child[ren]." *Id.* (citing *C.M.*, 652 N.W.2d at 211). We determine what procedure is constitutionally required by balancing three competing interests: "(1) the private interest affected by the proceeding; (2) the risk of error created by the procedures used, and the ability to avoid such error through additional or different procedural safeguards; and (3) the countervailing governmental interests supporting use of the challenged procedures."[10] *Id.*

---

[9] The parents do not cite the Sixth Amendment Confrontation Clause as the basis of this "right to confront," but we note nonetheless that there is no Sixth Amendment right to confront witnesses outside the context of a criminal proceeding. *See In re D.J.R.*, 454 N.W.2d 838, 846 (Iowa 1990). Rather, we read the parents' argument as a fundamental fairness claim that they should be permitted to hear the State's evidence and cross-examine witnesses.

[10] In their motions before the district court, the mother and father mention due process but cite no case authority, nor do their arguments specifically address the standards of proof for a due process violation. Normally, issues must be both raised and decided by the district court before we will address them on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). But the juvenile court, in its on-the-record ruling, addressed the three "competing interests" of the due process test. *See T.S.*, 868 N.W.2d at 432. Therefore, we conclude error was minimally preserved on the due process argument.

### 1. *Risk of error*

We begin with the risk of error attaching to the telephonic hearing. The parents assert they were denied the opportunity to be physically present during the taking of testimony and they "question[] the complete ability to be represented by counsel via phone."

Indeed, Iowa's TPR statute requires that the necessary parties in a TPR proceeding "receive notice and an opportunity to be heard." Iowa Code § 232.112(1); *see also Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982) ("When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." (footnote omitted)). Our supreme court has noted "that meaningful participation in a parental termination case requires actual knowledge of the testimony and documentary evidence offered in support of the petition." *M.D.*, 921 N.W.2d at 235. "Parents often have exclusive and particular knowledge of the evidence offered by the state to support the termination petition and need to hear it to understand the evidence needed to make an effective response." *Id.*

The mother also cites a "fundamental right" "to be present at a hearing." She relies on *Harter v. State*, 149 N.W.2d 827, 833 (Iowa 1967). In that TPR case, the supreme court certainly indicated the requirement of due process "ordinarily includes," among other rights, the right "to appear *or* be represented by counsel" at the TPR hearing. *Harter*, 149 N.W.2d at 833 (emphasis added). But the mother in that case actually was "present at the hearing," where her "counsel cross-examined the witnesses presented and introduced evidence on her behalf" and made arguments. *Id.* Our supreme court found her complaint "narrow[ed] down

to the claim she was denied a fair hearing because the decision was based on exhibits and testimony which would have been excluded under ordinary rules of evidence." *Id.* at 834. Thus, *Harter* is inapposite.

Contrary to the mother's view, our supreme court has not found a due process right to be physically present for a termination hearing. *See M.D.*, 921 N.W.2d at 234 (noting the appellant-mother did not ask the court to find such a due process right but listing cases from several jurisdictions rejecting that claim). In *M.D.*, the supreme court found a mother, who was incarcerated in a different state, was denied due process when the juvenile court only allowed her to participate in the termination hearing by telephone to give her testimony. *Id.* at 231. Although she had counsel, the court found she should have been afforded an opportunity to participate from the prison in the entire termination hearing "by telephone or other similar means of communication that enables the parent to hear the testimony and arguments at the hearing." *Id.* at 236. "The risk of error is too great if a parent does not have the opportunity to hear the evidence and to formulate a response to it." *Id.*

We proceed next to the additional safeguards suggested by prior cases and under the facts of this case.

### 2. *Ability to avoid error through additional safeguards*

In *M.D.*, the court found additional safeguards could have been ordered to abate due process violations caused by an incarcerated parent's inability to be physically present at a termination hearing. *See id.* at 236–37. The court emphasized, "[T]he process due in each case is flexible depending on the particular circumstances." *Id.* at 235.

The court first embraced the requirement that the juvenile court must allow parents to participate in the entire termination hearing, not just in giving their own testimony. *Id.* at 236. It imposed an obligation on the juvenile court to secure the participation of the parent by communication with the jail or prison facility holding the parent. *Id.* Second, the juvenile court must consider "alternative means of participation." *Id.* "In the event prison officials from other states, or other circumstances, do not permit the standard to be met, the juvenile court" should provide the absent parent an expedited transcript of the proceeding. *Id.* After reviewing the transcript, the parent should be permitted to testify by phone or teleconference, recall witnesses for additional cross-examination, and present any other testimony or documentary evidence. *Id.*

Thus, our case law directs that presence by telephone does not violate the right to due process when the parent is unable to be physically present due to incarceration. *See, e.g.*, *In re A.R.*, No. 19-1151, 2020 WL 825957, at *4 (Iowa Ct. App. Feb. 19, 2020) (finding incarcerated mother was not denied due process when she was present by telephone during the entire hearing, testified, and had counsel physically present at the hearing). In such cases, even providing a transcript of the proceedings the parent missed has been found sufficient to meet the requirement of due process, so long as the represented parent is informed of the evidence presented and given the opportunity to respond.

In the present case, alternative means were not necessary; the parents were able to participate in the entire termination hearing by telephone, the same as every other party and witness. The court also offered the parents additional safeguards in the form of frequent breaks to consult privately by telephone with

counsel. After each witness testified, the court questioned the parties as to whether they wanted to disconnect from the teleconference and confer privately with their separate counsel before proceeding. Both the mother and father availed themselves of this opportunity, and on several occasions counsel and clients agreed there was no need to confer, and the hearing proceeded without a break.

In addition, neither parent has identified any error or risk of error that occurred during the hearing as a result of the telephonic procedures other than generally "question[ing]" the ability of counsel to represent them. Both parents testified at the hearing, along with two witnesses for the State. The parents have not identified any cross-examination they were unable to perform; any testimony they were unable to give; any witness they were unable to call; any documents or physical evidence they were unable to view or offer; any discussion they were unable to hold with counsel; any difficulty with the technologies used; any inability to access a phone line or call into the teleconference; or any other deficiency affecting their rights. Nor do they identify any additional safeguards the court should have employed to avoid the risk of error other than granting the continuance. Finally, the parents do not raise or challenge the best-interests rationale for the court to order the telephonic proceeding rather than an in-person termination hearing.

We next examine the countervailing governmental interest supporting the teleconferencing procedures.

### 3. The countervailing governmental interests supporting use of the challenged procedures

The parents contend delaying the termination hearing would not have resulted in any negative consequences to the children. We too recognize they were in safe placements. With the benefit of hindsight, we can perhaps say that in-person hearings would resume within a few months[11] and perhaps that delay would not have caused significant detriment to the children.

But that was not the position of the juvenile court on April 3. Instead, the court had before it a motion to continue to an undeterminable date a termination hearing that had already been continued twice for five children who were the subject of two sets of CINA proceedings over six years and who had been out of parental care beyond the statutory limitations period for termination of parental rights. *See* Iowa Code § 232.116(1)(f)(4) ("The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months.").

---

[11] The April 6 supervisory order on juvenile justice ordered hearings to be continued at the court's discretion until after June 15. Iowa Supreme Ct. Supervisory Order, *In the Matter of Ongoing Provisions for Coronavirus/COVID-19 Impact on Child Welfare and Juvenile Justice Youth and Families* ¶7 (Apr. 6, 2020). The May 22 supervisory order continues the April 6 order but extends the postponement of in-person child-welfare hearings to July 13. Iowa Supreme Ct. Supervisory Order, *In the Matter of Ongoing Provisions for Coronavirus/COVID-19 Impact on Court Services* ¶41 (May 22, 2020). Thus, the earliest the court would have been able to set the hearing was fourteen weeks after the April 3 hearing date. The supreme court has since issued further guidance on resuming in-person hearings. See Iowa Supreme Ct. Supervisory Order, *In the Matter of Case Prioritization of Cases and Duties* (July 9, 2020); Iowa Supreme Ct. Supervisory Order, *In the Matter of Resuming In Person Court Services During COVID-19* (July 9, 2020); and Iowa Supreme Ct. Supervisory Order, *In the Matter of Resuming Family Law Trials Postponed by COVID-19* (July 9, 2020). But the earliest possible date a hearing could have been scheduled remains July 13.

Indeed, as our courts have emphasized for twenty years, "Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency." *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000). "Continuances may be detrimental to the best interests of children." *M.D.*, 921 N.W.2d at 233. "The focus of child welfare . . . is now on permanency, and continuances of court hearings to accommodate parents might offend this goal." *Id.*

Our rationale for adhering to the statutory timelines is well-known. In seeking the best interests of abused and neglected children, the "defining elements" are "safety and [their] need for a permanent home." *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially). "It is unnecessary to take from the children's future any more than is demanded by statute." *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) (quoting *In re A.C.*, 415 N.W.2d 609, 614 (Iowa 1987)). "Stated otherwise, plans which extend the twelve-month period during which parents attempt to become adequate in parenting skills should be viewed with a sense of urgency." *Id.* (quoting *A.C.*, 415 N.W.2d at 614).

At the same time, we recognize "it is also in the best interests of children that their parents have a full and fair opportunity to resist the termination of parental rights." *M.D.*, 921 N.W.2d at 236.

### 4. Striking a balance

Thus, the countervailing governmental interest of securing a permanent home for these children in adherence to the statutory timeframes is at odds with the parents' insistence that their interest in their relationships with their children could only be safeguarded by a fully in-person hearing. In these circumstances, as with an incarcerated parent, the balance tips in favor of the telephonic hearing.

The right to parent one's children is certainly among the most fundamental. And the risk of being unable to confer with TPR counsel moment to moment during the TPR hearing is significant. But the additional procedures the district court provided sufficiently mitigated those risks, considering that the offered breaks were private, frequent, and often declined. Tipping the scale further is the governmental interest in securing permanent homes for children in a timely fashion consistent with their best interests. We are persuaded that the telephonic hearing satisfied the requirements of due process in these circumstances.

We are further persuaded that the juvenile court correctly interpreted the supervisory orders as recognizing and embracing the urgency inherent in child-welfare proceedings. The supreme court put orders regarding juvenile matters, and specifically child-welfare matters, in a completely different division in its supervisory orders from criminal and general civil matters. While it broadly suspended all or most criminal and civil matters to later dates and encouraged the "liberal[]" granting of continuances for general civil matters, it left scheduling of child-welfare matters "at the discretion of the court." We view this as a recognition of the expediencies involved in child-welfare proceedings and the need for timely action in securing children permanent homes when the period for attempting family reunification has ended. Within the category of "juvenile matters," the supreme court also directed most delinquency matters to be subject to the applicable directives under the criminal proceedings division, furthering our belief that child-welfare matters occupy a unique position within our branch's mandate to provide court services, however ordinary or extraordinary the times. *See, e.g.*, Iowa R. App. P. 6.902(1)(d) (providing TPR cases are among those cases that "shall be

expedited on appeal"). The juvenile court correctly determined that interest was compelling and overcame the disadvantages of the telephonic hearing.

We recognize that *M.D.* dealt specifically with an incarcerated parent and the additional procedures directed under that decision may apply only in cases sharing those facts. *See* 921 N.W.2d at 236. We also understand that the process due to a parent depends upon the circumstances, and the parents here are in a somewhat different position: arguably, incarcerated parents bear some responsibility for their incarceration and inability to be present for a hearing. As we have said, the onset of the COVID-19 pandemic was beyond the parents' or the court's ability to control. Yet *M.D.* both approves telephonic hearings and directs courts to implement alternative procedures even in circumstances where the parent's absence is beyond their control, such as when "prison officials from other states, *or other circumstances*, do not permit" their attendance. *Id.* (emphasis added); *see also In re W.E.*, No. 19-2109, 2020 WL 1550699, at *3 (Iowa Ct. App. Apr. 1, 2020) (reversing termination of a father's parental rights where he was taken into custody before the first day of the termination hearing on a mental-health commitment order and was unable to be present for the State's evidence and finding, under *M.D.*, either the court should have continued the hearing or provided a transcript to the father). Again, that level of process was not required here, but *M.D.* suggests it would have met the requirements of due process anyway. The closest published case law we have analogous to the present situation surrounds incarcerated parents, so we extend the rationale in the absence of clear directives in another direction.

> Generally, the fundamental requirement of due process is an opportunity to be heard. This may include a right to notice of the hearing, to confront and cross-examine adverse witnesses, to be represented by counsel, to an impartial decision maker, and to a decision based solely on legal rules and the evidence presented at the hearing.

*In re A.M.H.*, 516 N.W.2d 867, 870 (Iowa 1994) (citation omitted). The parents have not shown they were denied due process.

### 5. April 6 supervisory order

The parents point out that a few days after the hearing, on April 6, the supreme court issued a new supervisory order specifically addressing the impact of COVID-19 restrictions "on child welfare and juvenile justice youth and families." Iowa Supreme Ct. Supervisory Order, *In the Matter of Ongoing Provisions for Coronavirus/COVID-19 Impact on Child Welfare and Juvenile Justice Youth and Families* (Apr. 6, 2020). Most of the new directives concerned families still in the reunification stage of child-welfare proceedings and emphasized expeditious reunification. With regard to CINA proceedings, the court updated its guidance, stating,

> Uncontested hearings should use remote technology. Contested hearings, such as a contested adjudication or termination hearing, may be conducted via remote technology if all parties agree, and thereafter file a written waiver of personal appearance or waive such appearance on the record. If one party objects to proceeding by phone, and the juvenile court believes the matter should nonetheless go forward and not be postponed, then the court can order telephonic testimony.

*Id.* at ¶7. We do consider that this change in the directive may be relevant to the question whether the court's decision met the requirement of due process. But the supervisory order itself is not applicable since it came several days after the hearing.

Yet the updated supervisory order reaffirmed the juvenile courts retain the discretion to set a remote hearing—if the court believes the matter should not be continued, it can order a telephonic hearing over the objections of the parties. That is the situation the parents were in, and we conclude that they were afforded due process through full participation in the telephonic hearing.

### 6. *Abuse of discretion*

Having determined the procedure used met the requirements of due process, the final question on this issue is whether the juvenile court abused its discretion in denying the motion to continue. We find no abuse. The court cited the uncertainty of when an in-person hearing could be set and weighed it against the best interests of the children in securing a permanent home consistent with statutory guidelines. No one could predict at that time how long the pandemic would last. The postponement of in-person hearings through supervisory orders had been extended twice. And even before that, the termination hearing had been continued twice beyond its original date. This was the second set of CINA cases for the children over a period of six years. They had been out of parental care for over a year and were making remarkable progress in their foster homes. The telephonic hearing offered sufficient safeguards for the parents' interests as supported by the supervisory orders and recent case law. We cannot say the court acted on reasons that are "clearly untenable or unreasonable." *A.M.*, 856 N.W.2d at 370.

Because we conclude the court afforded the parents adequate due process protections, we proceed to the merits of the appeals.

**B. Best Interests of the Children**

The parents contend the juvenile court erred in finding it was in the children's best interests to terminate their parental rights. They argue they were prepared to resume custody of the children in a safe environment because they have secured housing and employment and are working on their substance-abuse issues. They believe the juvenile court unfairly penalized them for their employment and substance-abuse treatment ending due to the COVID-19 pandemic, a factor outside of their control.

In making the best-interests determination, we give primary consideration to the children's safety, the best placement for furthering their long-term nurturing and growth, as well as their physical, mental, and emotional condition and needs. Iowa Code § 232.116(2); s*ee In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). Safety and the need for a permanent home mark the "defining elements" in a child's best interests. *J.E.*, 723 N.W.2d at 802 (Cady, J., concurring specially).

We acknowledge the parents' recent efforts to obtain employment and stable housing and address their substance-abuse issues. We recognize that the COVID-19 pandemic has put continuing their employment beyond their control. The lack of income has, in turn, affected their housing, as the grandparents have discussed evicting them if they are unable to pay the rent.

But this is the second set of CINA cases involving these children, and they have been under juvenile court supervision for over a year—all due to the same basic problems of the initial cases: unresolved substance-abuse and mental-health issues and inappropriate or inadequate housing exacerbated by the parents' financial situation. And because the parents' efforts have come at the eleventh

hour, we are not convinced they are permanent changes signaling a safe and stable future for these children. *See In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981) (finding insight into the long-range best interests of the child can be gleaned from "evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.")

Neither parent has completed substance-abuse treatment or consistently attended treatment, despite three different opportunities. They both tested positive for methamphetamine just two months before the termination hearing. The mother could not explain her positive result in February, claiming she had been sober since December. She also tested positive in January. The parents tested positive even while they were in outpatient treatment. We, like the juvenile court, find they could have continued treatment through the COVID-related closures—as evidenced by the mother's telephonic appointment the day before the hearing—but chose not to pursue it.

Their housing situation also remains unstable; they were not paying rent or utilities even when they were working. The grandparents were footing the bill, and they began considering eviction.

In assessing the best interests of the children, the juvenile court found the children have each demonstrated a clear improvement since their removal, noting "[t]hey are calmer, more well-behaved and are doing markedly better in school" in their respective placements. The foster parents also note remarkable improvement in their well-being—the children are seeing therapists, participate in other services, and have additional academic support as necessary. The foster parents support the children's access to these services and recognize their need

for them. Meanwhile, the parents have made little progress to demonstrate their own stability as parents. They have never moved beyond fully-supervised visitation. The FSRP[12] provider noted the father's inability to engage with all the children during his visitations or control his anger when provoked in front of them.

Given the shortcomings in the parents' sobriety and stability and the recency of their efforts toward positive changes, we believe the children have the greatest chance of a safe, permanent home life that meets their individual needs in the short- and long-term through termination of the mother and father's parental rights.

## C. Detriment to the Children Due to Parent-Child Relationship

In her separate petition on appeal, the mother contends termination of her rights would be contrary to Iowa Code section 232.116(3)(c), which permits the court to bypass termination if there is "clear and convincing evidence that the termination would be detrimental to the child[ren] at the time due to the closeness of the parent-child relationship[s]." The mother bears the burden to prove the permissive—not mandatory—factor applies to prevent termination. *In re A.S.*, 906 N.W.2d 467, 476–77 (Iowa 2018). She points again to her recent substance-abuse treatment and new home.

The juvenile court found no permissive ground under section 232.116(3) applied to this case. It noted, "The children will undoubtedly be sad about termination," but there were other aspects of the parenting "the children will not miss." In addition, "[a]ny sadness the child[ren] may experience because of

---

[12] FSRP is an acronym for family safety, risk, and permanency.

termination does not overcome the likely long-term hardship and neglect" they will suffer if parental rights are not terminated.

The record reflects the mother had generally appropriate interactions with the children during visitation—she was affectionate with the children and attentive most of the time. But little evidence was presented that she and the children share a bond[13] or that terminating her rights would be detrimental to them. Their placement with the foster families has been tremendously beneficial to their medical condition, mental health, and academic performance. Those considerations significantly outweigh any possible detriment the children would experience from severing the parent-child bond in this case. We agree the mother failed to show the permissive ground applies to prevent termination of her rights.

**AFFIRMED ON BOTH APPEALS.**

---

[13] On a few occasions, M.A. began crying at the end of visitation and said she wanted to stay. But for many of the visits, the more exciting draw for the children was the parents' puppy and interaction with their adult sister, who was also living in the home. D.A. affirmatively stated on multiple occasions he did not want to keep going to visitation, although his feelings stemmed more from his fractious relationship with the father.