**IN THE COURT OF APPEALS OF IOWA**

No. 20-0934
Filed October 21, 2020

**IN THE INTEREST OF H.V.,**
**Minor Child,**

**J.H., Mother,**
　　　Appellant.
_____

　　　Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.


　　　A mother appeals the termination of her parental rights to her now six-year-old son.  **REVERSED AND REMANDED.**


　　　Dusty Lea Clements of Clements Law and Mediation, Newton, for appellant mother.

　　　Thomas J. Miller, Attorney General, and Toby J. Gordon, Assistant Attorney General, for appellee State.

　　　Charles Fuson and Nicole Garbis Nolan of Youth Law Center, Des Moines, attorneys and guardians ad litem for minor child.


　　　Considered by Vaitheswaran, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

The juvenile court decided domestic violence, addiction, and mental-health concerns prevented Jessica from safely parenting her son, H.V. Jessica appeals the termination of her parental rights, raising five issues.[1] First, she argues the State failed to offer clear and convincing evidence H.V. could not be returned to her care. Driving that argument is her challenge to the State's exclusive reliance on electronic exhibits without calling witnesses at the termination hearing. Second, she asserts the court should have granted her six more months to achieve reunification. Third, she claims termination was not in H.V.'s best interests. Fourth, she complains the Iowa Department of Human Services (DHS) did not make reasonable efforts to return H.V. home. This complaint includes an allegation that the DHS discriminated against her because she took Adderall to treat her attention-deficit hyperactivity disorder (ADHD). And fifth, she argues that rather than terminating her rights, the court should have established a guardianship for H.V. with his aunt.

Because the first issue controls, we need not reach the remaining claims. "The State has the burden to prove its case by clear and convincing evidence." *In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016). In considering whether the State offered substantial evidence to support the statutory ground, we "review the facts as well as the law and adjudicate rights anew on those propositions properly preserved and presented to us." *In re O'Neal*, 303 N.W.2d 414, 422 (Iowa 1981).

---

[1] The juvenile court also terminated the rights of H.V.'s father, Randy. He is not a party to this appeal.

In our de novo review, we find the State failed to meet its burden when it rested its case without calling a single witness.

## I.     Facts and Prior Proceedings

H.V. tested positive for marijuana at his birth in May 2014.[2]  Based on the baby's drug exposure, the family received voluntary services from the DHS for about six months.  The family's next contact with the DHS occurred in 2016 when H.V.'s father, Randy, struck Jessica while she was holding the child.  Randy was arrested and later convicted of domestic abuse assault.  The parents acknowledged that H.V. witnessed domestic violence on other occasions.

About two years later, the DHS investigated reports that the parents were using methamphetamine while caring for H.V.  After testing positive for amphetamines and methamphetamine in October 2018, Jessica consented to temporary removal of H.V. from her custody.  The DHS placed H.V. with his maternal grandmother.

Jessica continued to struggle with substance-abuse and mental-health issues in the months after H.V.'s removal.  At an October 2018 substance-abuse evaluation, she reported having a prescription for Adderall to treat her ADHD.  The evaluator did not refer Jessica to substance-abuse treatment but instead

---

[2] We derive these facts from the child-in-need-of-assistance (CINA) proceedings. At the county attorney's request and without objection from the parents' attorneys, the juvenile court took judicial notice of H.V.'s CINA file.  Our supreme court allows courts considering termination petitions to take judicial notice of the CINA case. *See In re Adkins*, 298 N.W.2d 273, 277–78 (Iowa 1980).  But *Adkins* requires the parties to follow "certain safeguards," including marking and identifying the parts of the record being noticed.  *Id.* at 278 ("Otherwise, a meaningful review is impossible.").  That proviso was not followed here, somewhat hindering our review.

recommended a mental-health assessment. Yet Jessica again tested positive for amphetamines and methamphetamine in December.

In March 2019, Jessica underwent the recommended mental-health evaluation. She told the counselor that she was "getting Adderall on the streets because her primary doctor would no longer prescribe it to her." Later that spring, Jessica addressed her addiction, providing negative drug screens in March, April, and May. She also attended Alcoholics Anonymous/Narcotics Anonymous meetings. Based on her progress, the DHS allowed her semi-supervised visitation.

But in June, Jessica failed to provide drug tests, claiming the samples were contaminated. Her sweat patch tested positive for amphetamines and methamphetamine in late June, though she denied using drugs. A few days later, she sought renewed treatment for her ADHD and received a thirty-day prescription for Adderall. The next month, she again tested positive for amphetamines and methamphetamine. Based on this setback, her visitation moved back to fully supervised. In August, she tested positive for amphetamines but negative for methamphetamine. Those same test results recurred in September and October.

Jessica also reengaged with Randy that August, allowing him to talk to H.V. on the phone from jail—against DHS directives. Meanwhile, tensions grew between Jessica and her mother, prompting the court to change H.V.'s placement. After a short stint with a foster family, H.V. went to live with his Aunt Crystal in August 2019. The DHS believed Crystal could draw appropriate boundaries with H.V.'s parents and protect him from any risk posed by Jessica's drug use. And Crystal has supported H.V.'s therapy for his diagnosis of post-traumatic stress disorder tied to his early childhood traumas.

In October, DHS caseworker Heather Bush recommended the court grant Jessica a six-month extension to reunify with H.V.  The worker wrote: "Jessica is doing a lot of work and trying very hard right now."  Nevertheless, the State filed its petition to terminate parental rights in November.  The juvenile court combined the permanency hearing with the termination-of-parental-rights trial, which spanned three days between December 2019 and February 2020.  The State declined to call any witnesses and instead presented its entire case through electronic exhibits.[3]  Jessica's counsel objected to the exhibits, arguing: "I would like to see them come in through proper foundation through the appropriate witness."  When the court asked what foundation was lacking, counsel responded:

> [W]e have a fairly lengthy amount of cross-examination for the DHS workers in this case.  And while we can call them as our witnesses, I feel like that's almost shifting it to us to present the case.  And I think the State needs to . . . meet [its] burden and call the witnesses to testify, and then we would be able to . . . cross-examine the DHS workers.

The court overruled counsel's lack-of-foundation objection to the State's exhibits.  The court added that if parents' counsel decided to call the DHS workers to testify,

---

[3] Those exhibits included: (1) TPR report by DHS (November 26, 2019); (2) mother's mental-health evaluation (March 5, 2019); (3) mother's therapy letter (June 6, 2019); (4) H.V.'s therapy letter (June 8, 2019); (5) Recovery Court letter (September 5, 2019); (6) mother's therapy letter (August 2, 2019); (7) mother's therapy letter (October 3, 2019); (8) H.V.'s therapy letter (September 27, 2019); (9) mother's hair test (August 14, 2019); (10) lease offered by mother's counsel (September 28, 2019); (11) mother's substance-abuse evaluation (October 25, 2018); (12) father's criminal history; (13) father's petition to plead guilty; (14) father's sentencing order; (15) father's Polk County jail call record; (16) H.V. therapy update (December 3, 2019); (17)–(19) letters in support of Jessica; (20) Jessica's prescription for Adderall; (21) text message from DHS worker on visitation; and (22) mother's family safety, risk, and permanency (FSRP) report (December 2, 2019).  The State also offered twenty-seven exhibits, without any testimony, as part of the CINA-permanency proceeding.

the law allowed counsel to treat them as hostile witnesses. The court also granted the State's request to take judicial notice of the CINA file.

So in an unusual turn, the court admitted the State's exhibits, and the State rested its case. Jessica's counsel then called all the witnesses, including DHS caseworkers Heather Bush and Alicia Bechtel, her mental-health and substance-abuse counselor, the FSRP provider, H.V.'s therapist, and H.V.'s aunts. Jessica also testified. At the February 2020 hearing, she discussed her mental health, particularly her ADHD, and her addiction to Adderall. She also testified she had a job, stable housing, and would be able to care for H.V.

The State cross-examined those witnesses but did not circle back to lay a foundation for any of its exhibits. After a third day of hearings in early February, the court left the record open for two weeks for the parties to submit written closing arguments. Jessica's closing argument included the following critique of the State's case:

> The undersigned attorney, on behalf of the Mother, does not believe that the State met [its] burden and proved by clear and convincing evidence that the mother's rights to the child should be terminated. The State did not present any witnesses in this case and relied solely on the exhibits that were filed. No updated termination report was filed for the second and third days of the hearing.

The State did not file a closing argument. Neither did H.V.'s guardian ad litem.

In its finding of facts, the juvenile court relied on the State's exhibits, which were offered and admitted without any witnesses to lay foundation for their authenticity or identification. *See* Iowa R. Evid. 5.901. The court also shared its personal observations that Jessica's actions were "consistently strange and

disruptive" during the three-day trial.[4]  In its conclusions of law, the court terminated Jessica's parental rights under Iowa Code section 232.116(1)(f) (2019).

## II.    Analysis

As a natural parent, Jessica has a fundamental liberty interest in raising H.V.  *See Santosky v. Kramer*, 455 U.S. 745, 753 (1982).  That interest "does not evaporate simply because . . . [she has] not been [a] model parent[]."  *Id.*  Given the heft of that fundamental interest and to minimize the risk of its deprivation, we impose a significant burden on the State to prove the elements of its termination allegation by clear and convincing evidence.  *See M.S.*, 889 N.W.2d at 679.  "Clear and convincing" is the highest evidentiary burden in civil cases and means we should harbor "no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence."  *See id.*

The State alleged that the juvenile court should terminate Jessica's rights under section 232.116(1)(f).  That section allows the court to terminate rights if the State establishes these elements:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

---

[4] The court noted at the end of the third day of hearings that Jessica's "demeanor and physicality" were "markedly different" from the other hearing dates in December 2019 and January 2020.  The court specified: "There was not that type of jerky, over-the-top motion that I described previously.  But then from 3:00 to now—it's 4:12.  After the 3:00 break, I did notice the mother struggling repeatedly to stay awake.  There were long periods of time where she had her eyes closed."

Iowa Code § 232.116(1)(f). Jessica only challenges the State's proof of the fourth element—that H.V. cannot be returned to her custody without exposing him to harm that would merit a new CINA adjudication. *See M.S.*, 889 N.W.2d at 680. She argues the State failed to meet its significant burden because it called no witnesses to lay a proper foundation for its exhibits and did not update those exhibits when the proceedings spanned three months. She contends the court should have sustained her objection to the exhibits. By not doing so, in her view, the court shifted the burden of proof.

Although neither party cites Iowa Code section 232.96, that provision governs the admissibility of evidence in child-welfare cases. *See In re E.J.R.*, 400 N.W.2d 531, 531 (Iowa 1987) (applying section 232.96 to termination proceedings). As a baseline, "[o]nly evidence which is admissible under the rules of evidence applicable to the trial of civil cases shall be admitted" in a child-welfare proceeding, except as otherwise provided in this section. Iowa Code § 232.96(3). An exception appears in section 232.96(6):

> A report, study, record, or other writing or an audiotape or videotape recording made by the department of human services, a juvenile court officer, a peace officer or a hospital relating to a child in a proceeding under this division is admissible notwithstanding any objection to hearsay statements contained in it provided it is relevant and material and provided its probative value substantially outweighs the danger of unfair prejudice to the child's parent, guardian, or custodian. The circumstances of the making of the report, study, record or other writing or an audiotape or videotape recording, including the maker's lack of personal knowledge, may be proved to affect its weight.

Under this section, "certain hearsay evidence that would be otherwise prohibited by the Iowa Rules of Evidence is expressly admissible in such proceedings." 7

Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.1101:3 (Nov. 2019 update); *see In re Long*, 313 N.W.2d 473, 478 (Iowa 1981) (upholding admission of social services report because "person who prepared the exhibit was closely cross-examined regarding the circumstances of the making of the report and the sources for the information contained in it").[5]

The exception in subsection (6) does not apply here. Jessica's counsel did not object to the exhibits on hearsay grounds.[6] She objected because the State did not venture to lay any foundation for the more than one dozen electronic exhibits it relied on to prove its case. Our rules require the proponent of an exhibit to produce evidence sufficient to support a finding that it is what the proponent claims. *See* Iowa R. Evid. 5.901(a). The rule then lists examples of how to authenticate or identify evidence—chief among them is to call a witness with knowledge of the exhibit. *See id.* at 5.901(b)(1)–(10).

---

[5] In addressing a similar issue, our court stated: "What *Long* does not stand for is the proposition that the State need not call foundational witnesses in CINA cases." *In re A.C.*, No. 13-1045, 2013 WL 5962918, at *2 (Iowa Ct. App. Nov. 6, 2013). Still, our court affirmed the CINA adjudication in *A.C.*, citing *In re Delaney*, 185 N.W.2d 726, 732–33 (Iowa 1971), a delinquency case where the court held the juvenile had a burden to exhaust the legal process for securing the desired witnesses for cross-examination. *Id.* We decline to follow *A.C.* because that case did not address the question of burden-shifting raised by Jessica here.

In other opinions addressing section 232.96, we were not faced with the State trying to prove its entire case with exhibits that lacked foundational witnesses. *See, e.g.*, *In re B.H.*, No. 17-1190, 2017 WL 484627 at *3 (Iowa Ct. App. Oct. 25, 2017) (noting court sustained objections to some exhibits but "allowed the State to establish the other exhibits' admissibility during the hearing."); *In re C.W.N.*, No. 07-1368, 2007 WL 2965057, at *2–3 (Iowa Ct. App. Oct. 12, 2007) (noting mother's challenge to the admission of three exhibits); *In re J.M.*, No. 00-1122, 2001 WL 194993, at *6 (Iowa Ct. App. Feb. 28, 2001) (addressing objection to exhibits offered by guardian ad litem and noting in part that author of DHS case permanency plans was called as a witness).

[6] Also, only two of the State's exhibits appear to fit under the categories listed in section 232.96(6).

The State defends the court's exercise of discretion in admitting the relevant exhibits. First, the State contends "witness testimony presented by the mother supported the authenticity of the exhibits." Second, in the State's view, the court's own observations provided "an additional basis beyond the written documents" for its ruling. In general, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must *produce evidence* sufficient to support a finding that the item is what the proponent claims it is." Iowa R. Evid. 5.901(a) (emphasis added). The State does not argue that its exhibits were self-authenticating. *See* Iowa R. Evid. 5.902 (explaining "self-authenticating" documents "require no extrinsic evidence of authenticity to be admitted").

The State's argument is unconvincing for two reasons. First, the rule requires the *proponent* of the exhibit to produce evidence to support authenticity. *See* Iowa R. Evid. 5.901(a). Second, the record does not show authentication occurred through Jessica's witnesses. For instance, Jessica's counsel asked DHS worker Bechtel if she "had a chance to review every exhibit that's been filed in this case," and she answered "no." It does appear that Bechtel prepared State's Exhibit 1, Termination of Parent/Child Relationship: Report to the Court, dated November 26, 2019.[7] And on cross-examination, the State did ask Bechtel about references in her report. Beyond that, the State made no concerted effort to authenticate its exhibits through Jessica's witnesses.

Finally, we are troubled by the State's reliance on Jessica's decision to call the DHS worker because not doing so may have waived her challenge to

---

[7] Although the electronic document has signature lines on the last page, neither Bechtel's nor her supervisor's signatures, actual or electronic, appear there.

admission of the exhibits. *See Long*, 313 N.W.2d at 479 ("[A]lthough the social services report was available to Denise before the adjudicatory hearing, she did not exercise her right to subpoena any of the third parties whose statements were included in the report and who were not otherwise called as witnesses by the State. She therefore cannot complain that her confrontation rights were denied by the admission of the report."). Although this case does not involve a confrontation clause challenge, the reasoning in *Long* could have raised concerns for Jessica.

***Shifting burden of proof****.* The State's lax approach to proving its petition and the court's admission of the electronic exhibits with no foundational witnesses had the effect of shifting the burden to Jessica to disprove the allegations. Like any legal proceeding, a termination trial requires the petitioner to offer evidence to satisfy its burden of proof. Here, the State rested its case before authenticating the reports offered into evidence. Even if the State is correct in claiming it cured that deficiency through Jessica's witnesses, Jessica did not waive her right to challenge the sufficiency of the State's evidence in this appeal. *Cf. State v. Nino-Estrada*, No. 11-1741, 2012 WL 4513874, at *6 (Iowa Ct. App. Oct. 3, 2012) (finding no Iowa precedent allowing appellate court to consider evidence presented by defense to supply missing elements necessary for State to carry its burden of proof in criminal case). The State must prove a prima facie case for termination before the parents can be expected to present evidence of their fitness.

***Failure to update information****.* But even if we consider the evidence developed by the State in cross-examining Jessica's witnesses, as well as the judicially noticed CINA file, the record did not support termination when the trial ended in February. The State must offer clear and convincing evidence that at the

present time Jessica's son H.V. could not be safely returned to her custody. We interpret "present time" to mean the time of the termination hearing. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). On the hearing's third day, February 4, Jessica testified that the DHS last asked her to take a drug test in October 2019. She acknowledged an addiction to Adderall and expressed a desire to "wean" herself off that drug. She testified she was tending to her mental-health needs. Also, she confirmed that she had work and stable housing—a rented apartment in Altoona. Jessica expressed disappointment that the DHS had cut her visitation with H.V. to once per week after the January hearing.

The State cross-examined Jessica but offered no updated information from the DHS or FSRP workers. The most recent DHS report offered by the State was compiled more than three months earlier. The State also bypassed the opportunity to file a written closing argument. This record lacks clear and convincing evidence that H.V. could not be returned to Jessica's care on the day of the final hearing.[8] *Contrast In re Z.P.*, ___ N.W.2d ___, ___, 2020 WL 5268435, at *4 (Iowa 2020) (upholding termination under paragraph (f) because "record shows a number of reasons why [father] was not prepared to assume a parenting role at the time of trial").

The DHS also had an obligation to continue making reasonable efforts to reunify the family until the juvenile court issued either a final written termination order or a waiver. *In re L.T.*, 924 N.W.2d 521, 530 (Iowa 2019). Without any current evidence from the State, we do not know if the DHS satisfied that

---

[8] The order terminating Jessica's parental rights was not filed until June, four months after the final hearing and seven months after the final DHS report.

obligation. *See id.* (noting the State must show "reasonable efforts as a part of its ultimate proof"). On this record, we retain substantial doubts about the State's proof and cannot uphold the termination order.

**REVERSED AND REMANDED.**

Vaitheswaran, P.J., concurs; Schumacher, J., dissents.

**SCHUMACHER, Judge** (dissenting).

Respectfully, I dissent from the majority opinion.

Central to the majority's opinion reversing termination of the mother's parental rights is the State's election to rest its case after the juvenile court admitted twenty-one exhibits into the termination file over the mother's objection. Because the juvenile court is instructed to admit all relevant and material evidence, the case managers were available for cross-examination, the juvenile court did not create a shifting of the burden of proof, and the mother suffered no prejudice, termination of the mother's parental rights pursuant to Iowa Code section 232.116(1)(f) (2019) is supported by the record. Additionally, termination was in H.V.'s best interest, a guardianship was not the preferred permanency option under the facts of this case, a six-month extension was not warranted, and reasonable efforts were provided to the mother for a one-year period.

First, critical to this review is the acknowledgment of rights embodied in a parent-child relationship.

> There is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship, and it must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right that should be infringed upon only under the most compelling circumstances. Because the involuntary termination of parental rights interferes with a fundamental, basic liberty, freedom from governmental interference with family relationships and child rearing, courts must strictly adhere to the applicable law, and require proof by clear and convincing evidence.

146 Am. Jur. *Trials* § 467 (2016). Finding proof by clear and convincing evidence in this record concerning then five-year old H.V., the juvenile court order should be affirmed. Each of the mother's arguments is addressed in turn.

**Admission of Exhibits**

The mother challenges the admission of the exhibits offered by the State at the beginning of the proceeding. As noted by the majority, the juvenile court is guided by Iowa Code section 232.96(6), which states as follows:

> A report, study, record, or other writing or an audiotape or videotape recording made by the department of human services, a juvenile court officer, a peace officer or a hospital relating to a child in a proceeding under this division is admissible notwithstanding any objection to hearsay statements contained in it provided it is relevant and material and provided its probative value substantially outweighs the danger of unfair prejudice to the child's parent, guardian, or custodian. The circumstances of the making of report, study, record or other writing or an audiotape or videotape recording, including the maker's lack of personal knowledge, may be proved to affect its weight.

Our juvenile courts are also guided by case law. Overall, juvenile hearings may be conducted in a more informal manner than other court proceedings. *See In re A.S.*, 743 N.W.2d 865, 868 (Iowa Ct. App. 2007); *see also* Iowa Code §§ 232.99(2) (directing the juvenile court to admit "all relevant and material evidence" at dispositional hearings); 232.104(1)(c) (stating permanency hearings should be similarly conducted); *see also In re K.F.*, 437 N.W.2d 559, 563 (Iowa 1989) (stating "evidence properly admissible in an adjudication proceeding should be accorded the same standard of admissibility in a subsequent termination hearing").

At the initiation of the combined termination and permanency hearing, held on December 10, 2019, January 9, 2020, and February 4, 2020, the State offered twenty-one exhibits into the termination file.[9] Fourteen of the exhibits offered by

---

[9] The State additionally offered exhibits into the underlying child-in-need-of-assistance file. The mother objected to these exhibits.

the State were filed by the mother, including her therapy records, her prescription for Adderall, and letters of support. None of the exhibits offered contained an identifying marker or sticker.[10] The mother objected to the State's offer of exhibits.[11]

The following exchange occurred between counsel for the mother and the court after the State's offer of exhibits:

> The Court: Mother's counsel?
> Mother's Counsel: I guess I would just clarify. Is the State intending the call the DHS workers to testify?
> The State: Not at this point.
> Mother's Counsel: I guess I would ask that they call the DHS workers to testify. And then I–for efficiency purposes I have no issue with the exhibits coming in at the beginning through the DHS workers' testimony.
> The Court: Okay. So in terms of–I think the State gets to choose who they call as witnesses. Do you have any objection to the outstanding exhibits?
> Mother's Counsel: I guess I would like to see them come in through proper foundation through the appropriate witness.
> The Court: Okay. So your objection is foundation.
> . . . .
> The Court: Thank you. And specifically what area of foundation is lacking on the exhibits of behalf of the mother?
> Mother's Counsel: I think, Your Honor, we would just ask–obviously we have a fairly lengthy amount of cross-examination for the DHS workers in this case. And while we can call them as our witnesses, I feel like that's almost shifting it to us to present the case.

---

[10] "The clarity of the appellate record benefits by having exhibit stickers on the electronically submitted exhibits. The exhibits contained in this record do not have exhibit stickers or other markings indicating the number of the individual exhibits." *In re N.G.*, No. 19-1732, 2020 WL 825965, at *1 n.3 (Iowa Ct. App. Feb. 19, 2020). "Our independent review of the record is decidedly more difficult due to the absence of exhibit stickers or other identifying markers on the bulk of the exhibits. It is critical for review of the trial court record that the exhibits contain an identifier on the exhibit." *In re A.D.*, No. 19-1459, 2020 WL 105093, at *4 n.7 (Iowa Ct. App. Jan. 9, 2020). Also, "[i]t is essential for our review that exhibits have some identifying information." *In re J.W.*, No. 14-0515, 2014 WL 3749419, at *2 n.1 (Iowa Ct. App. July 30, 2014).

[11] The record is not clear as to whether the mother objected to the admission of her own exhibits through the State's offer.

> And I think the State needs to make their burden and–meet their burden and call the witnesses to testify, and then we would be able to cross-examination–cross-examine the DHS workers.

The court overruled the objection and allowed counsel for the mother to treat the DHS witnesses as adverse witnesses.

We review the juvenile court's decision for an abuse of discretion. *In re C.N.*, No. 07-0646, 2007 WL 1486139, at *3 (Iowa Ct. App. May 23, 2007). We consider whether the mother was prejudiced by the juvenile court's decision. *See In re C.D.*, 508 N.W.2d 97, 100 (Iowa Ct. App. 1993). The erroneous admission of evidence will not result in reversal unless the evidence is prejudicial. *A.S.*, 743 N.W.2d at 869. Evidence that is merely cumulative is not prejudicial. *Id.*

Even when, as viewed by the majority, the mother's objection was purely an objection to foundation, Iowa Code section 232.96 speaks to this concern.[12] "The circumstances of the making of report, study, record or other writing or an audiotape or videotape recording, including the maker's lack of personal knowledge, may be proved to affect its weight." Iowa Code § 232.96.

On close review of the objection as to the exhibits, the concern raised by the mother relates to the ability to cross-examine the DHS worker. The right of confrontation is derived from the Sixth Amendment, which applies to criminal or quasi-criminal proceedings. A child in need of assistance is "a special proceeding,

---

[12] "A sustained 'no foundation' objection means that the opposing attorney has failed to establish the prerequisites for introducing evidence. The objection could refer to failure to lay the foundation for a hearsay exception, failure to authenticate a writing, or failure to show that the witness has personal knowledge, among others." Roger C. Park & Aviva Orenstein, *Trial Objections Handbook 2d: No Foundation* § 6:19 (2020).

the objective of which is to determine the child's best interest and welfare." *See In re Delaney*, 185 N.W.2d 726, 728 (Iowa 1971). In *Delaney,* our supreme court stated that when certain documentary evidence is furnished in a timely fashion to opposing counsel, the opposing party has a duty to attempt to secure the desired witnesses in order to preserve error on the issue. 185 N.W.2d at 732–33.

The precept that emerges from the decision in *Delaney* is that where the purpose of confrontation is secured, that is, an opportunity for cross-examination, the right of confrontation is not violated. *Id.* at 733. That right was found to be secured under former sections 232.31 and 232.46, and we find it remains secure in the present law through the opportunity to show "[t]he circumstances of the making of the report, study, record or other writing, including the maker's lack of personal knowledge . . . ." *See* Iowa Code § 232.96(6). This right is facilitated not only by the right to examine the maker of a written document but also by the statutory right to demand issuance of subpoenas requiring the attendance and testimony of witnesses and production of papers. This affords a party, such as H.V's mother, the right and opportunity to subpoena any witness for examination or cross-examination, whether that person be the maker of a written document or one who has given information to the maker.

The Iowa Supreme Court has stated:

Coupled with the right of subpoena is the unrestricted statutory right of a parent, guardian or custodian to inspect and have disclosed the contents of pertinent juvenile court records. When exercised, this right provides ample opportunity to gain information which will aid in preparing for hearing. Such records should reveal the evidence and the names of persons whose reports or statements are relied on by the State to prove its case. Inspection of these records will afford both a basis for readiness for cross-examining witnesses and for

> determining the witnesses to be called to rebut the State's evidence or to support the contentions of the parent, guardian or custodian.
>
> Hence, the means for confrontation are available to a parent, guardian or custodian in a CHINA action, and we are thus satisfied that the opportunity for confrontation is preserved. "The provisions of chapter 232 seek to retain the advantages of an informal hearing in juvenile court while providing safeguards which will guarantee each party his or her fundamental rights to a fair hearing."

*In re Long*, 313 N.W.2d 473, 479 (Iowa 1981) (citations omitted).

Our court has previously addressed a similar issue concerning an objection to "reports prepared and filed in the underlying CINA case because the author did not testify at the termination hearing." *See In re C.W.N.*, No. 07-1368, 2007 WL 2965957, at *3 (Iowa Ct. App. Oct. 12, 2007). In such case, our court noted that Iowa Code section 232.96(6) authorizes the admission of these types of documents over a hearsay objection. *Id.* We additionally found that as a department supervisor, who signed the cover letter accompanying two of the three exhibits, was present at the termination hearing and available for cross-examination, such argument should be rejected. *Id.*

In the case *In re J.M.*, a mother objected to exhibits submitted by a guardian ad litem based on lack of foundation. No. 00-1122, 2001 WL 194993, at *5 (Iowa Ct. App. Feb. 28, 2001). We found "[t]he admission of these exhibits caused no surprise or unfair prejudice to [the mother], and they are properly before us." *Id.* at *7. Some of the exhibits had been admitted during the CINA proceedings without objection. *Id.* at *6. We noted that for the exhibits created by the Court Appointed Special Advocate (CASA), the mother was able to call the CASA as a witness and question her about the exhibits. *Id.* at *7. We concluded there was no unfair prejudice to the mother. *Id.*

Furthermore, in *In re B.H.*, a father objected to certain exhibits based on a lack of foundation. No. 17-1190, 2017 WL 4842527, at *3 (Iowa Ct. App. Oct. 25, 2017). We found that many of the reports the father objected to had been routinely accepted since the case's inception. *Id.* at *4. We also found the father had the opportunity to testify and challenge the information in the reports. *Id.* We concluded the exhibits were not prejudicial because they were cumulative to other evidence in the record. *Id.* "Additionally, his attorney was present and able to zealously cross-examine the witnesses." *Id.* We determined there was no abuse of discretion in the admission of the exhibits. *Id.*; *see also In re J.M.*, No. 16-1108, 2016 WL 4544382, at *6 (Iowa Ct. App. Aug. 31, 2016) (finding no abuse of discretion in the admission of exhibits where the exhibits were cumulative, as they had already been admitted in the CINA proceedings without objection and the court took judicial notice of the CINA file without objection).

Additionally, this court rejected an objection to foundation, finding that the exhibits were relevant and not unduly prejudicial. *See In re A.H.*, No. 17-0025, 2017 WL 1278371, at *3 (Iowa Ct. App. Apr. 5, 2017). Finding the admission of the relevant and material evidence was not in error, the evidence is next reviewed to determine whether it rises to the level of clear and convincing.

The allowance of the exhibits is also consistent with *Harter v. State*, 149 N.W.2d 827, 829 (Iowa 1967), in which the court held that

> evidence, which under ordinary rules of evidence applicable to a civil trial would be excluded as hearsay, lacking a proper foundation, improper opinion evidence, or not the best evidence, is admissible in [termination] proceedings and the nature of the evidence is to be considered as it affects its probative value rather than its admissibility.

*See also In re H.R.K.*, 433 N.W.2d 46, 48–49 (Iowa Ct. App. 1988) (quoting *Harter*, 149 N.W.2d at 829).

**Statutory Ground for Termination**

Based on the record before our court, I agree with the juvenile court's conclusion that clear and convincing evidence supports a finding that the child could not be returned to mother's care at the time of the termination hearing. The mother continued to struggle with substance-abuse and mental-health issues in the underlying child-in-need-of-assistance case. The mother's drug test in December 2018 was positive for methamphetamine. Approximately six months before the termination hearing, the mother failed to cooperate with drug testing. Drug test results for the mother in June 2019 were positive for amphetamines and methamphetamine, although she denied using drugs. In July 2019, the mother again tested positive for amphetamines and methamphetamine. In August, September, and October, she tested positive for amphetamines.[13] In October 2019, she removed her own sweat patch and threw it way. As noted by the juvenile court, she has denied any issue with methamphetamine and therefore the issue remains unaddressed.

Additionally, the mother continued in her relationship with the child's father, who has committed domestic abuse against the mother in the child's presence. Recordings of jail phone calls between the mother and the father were admitted without objection, evidencing an ongoing relationship between the two. The

---

[13] The DHS worker testified the positive test for amphetamines was anticipated due to the newly obtained prescription for Adderall.

mother additionally acknowledged allowing the father to stay at her house after he was released from jail.

**Six Month Extension Pursuant to Iowa Code section 232.104(2)(b)**

The mother also raises an issue concerning the juvenile court's declination to grant a six-month extension to achieve reunification. In support of that argument, the mother points to her testimony that she loves her child and would do whatever it takes to have him returned to her care. However, her actions since the inception of the child-in-need-of-assistance case, over a year prior to the termination hearing, do not support the requested extension.

In order to continue placement for six months, the statute requires the court to make a determination that the need for removal will no longer exist at the end of the extension. *See* Iowa Code § 232.104(2)(b). Under some circumstances, extensions could be appropriate. *In re A.C.*, 415 N.W.2d 609, 614 (Iowa 1987). "The judge considering them should however constantly bear in mind that, if the plan fails, all extended time must be subtracted from an already shortened life for the children in a better home." *Id.*

In order to grant a six-month extension, the court must be able to "enumerate the specific factors, conditions, or expected behavioral changes," providing a basis to determine the children will be able to return to the parent at the end of the additional six months. Iowa Code § 232.104(2)(b). The burden is not on the State to prove an extension is not appropriate. *See id.* Rather, the court needs evidence to support a finding the mother would be able to care for the child within six months in order to grant an extension. While DHS initially recommended an extension, this recommendation was changed when the mother threw away her

drug test two months prior to the termination hearing. The juvenile court was unable to make a finding in support of the requested extension in part because of the mother's lack of progress, finding the mother could not resume custody in six months as "the mother has not even started to truthfully address her substance abuse."

Notably, H.V. has been involved with DHS since 2014. A founded child abuse assessment was completed in 2014, naming the mother as the perpetrator of abuse for the presence of illegal drugs in a child when H.V. was born testing positive for marijuana. Despite the positive test for marijuana, the mother denied using marijuana while she was pregnant. A family assessment was completed in 2016. During that assessment, the mother told the investigator the father had punched her in the forehead while she was holding H.V. and tackled her to the ground. She also reported that H.V. had been knocked over during the fight. The father reported the mother kicked him and ripped his sweatshirt. Further services were not recommended as the father was incarcerated and a no-contact order was issued. However, the mother later successfully moved to terminate the no-contact order.

H.V. again came to the attention of DHS when his mother tested positive for methamphetamine and amphetamines. The mother was named as the perpetrator of abuse for a second time, with H.V. as the child subject. During this assessment in late 2018, the mother reported using illegal drugs a month prior. H.V. was removed from parental custody and adjudicated a child in need of assistance on November 27, 2018. The mother failed to complete three drug screens between the filing of the adjudication petition and disposition. Following

disposition, H.V. remained out of parental custody. A social history was submitted to the court at the time of disposition, in which the mother reported the father had whipped her with a purse strap. Also in the social history, the mother reversed course on the use of drugs while pregnant, indicating she used marijuana before she knew she was pregnant. As testified to by DHS, the mother has made little progress in the case plan due to her "refusal to acknowledge an issue."

**Best-Interests Determination**

The mother also argues termination of her parental rights is not in the child's best interests. Even if the statutory requirements for termination are met, the decision to terminate must still be in the best interests of the child. *In re N.H.*, 383 N.W.2d 570, 574 (Iowa 1986); *In re D.W.K.*, 365 N.W.2d 32, 34–35 (Iowa 1985). The best interests of the child are paramount considerations in determining whether to terminate parental rights. *In re L.L.*, 459 N.W.2d 489, 493 (Iowa 1990); *N.H.*, 383 N.W.2d at 574. In assessing the best interests of the child, we evaluate the child's long-range as well as immediate interests. *In re K.F.*, 437 N.W.2d 559, 560 (Iowa 1989). We must consider what the future likely holds for the child if returned to his or her parents. *Id.* We gain insight into the child's prospects by reviewing evidence of the parent's past performance—for it may be indicative of the parent's future capabilities. *Id.* We give primary consideration to the physical, mental, and emotional condition and needs of the child. *In re J.W.D.*, 456 N.W.2d 214, 217 (Iowa 1990).

H.V. has a post-traumatic stress diagnosis, stemming from domestic abuse and drug exposure. He is in a home with a relative who has been able to demonstrate protective capabilities and provide for H.V. This home is willing to

adopt. Bearing in mind the child's young age and his needs, termination is in his best interests.

**Reasonable Efforts**

Additionally, the mother asserts the Iowa Department of Human Services failed to make reasonable efforts in not requesting a drug test after October 2019 and in not expanding the visitation just prior to the termination hearing. When the State removes a child from a parent's care, the State has an obligation to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). In making reasonable efforts, "[a] child's health and safety shall be the paramount concern." Iowa Code § 232.102(12)(a) (defining reasonable efforts). The State's duty to make "reasonable efforts is not viewed as a strict substantive requirement of termination." *C.B.*, 611 N.W.2d at 493. The State has the burden to "show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *Id.*

However, the mother did not request additional services until shortly before the termination hearing. The efforts of DHS to conduct previous drug screens were often thwarted by the mother. The last sweat patch, placed at DHS's request just shortly before the termination hearing, was thrown away by the mother without testing. Such does not amount to a denial of reasonable efforts.

With respect to the mother's request for additional visitation just prior to the termination hearing, we have previously found the State's duty to make reasonable efforts encompasses a visitation arrangement "designed to facilitate reunification

while protecting the child from the harm responsible for the removal." *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996).

> Visitation, however, cannot be considered in a vacuum. It is only one element in what is often a comprehensive, interdependent approach to reunification. If services directed at removing the risk or danger responsible for a limited visitation scheme have been unsuccessful, increased visitation would most likely not be in the child's best interests.

*Id.* The mother's visitation was initially fully supervised after removal. At a point in the CINA proceeding, the visitation progresses to semi-supervised. However, after a positive test for methamphetamine, the visitation reverted to fully supervised. The juvenile court found that the Department's actions in that regard were reasonable, specifically noting the mother's behavior in the courtroom inappropriate and that her behavior would be "disturbing for any child to witness." The juvenile court further found that H.V. struggled with his mother's instability, drama, and addiction. H.V.'s placement was concerned about H.V.'s behavior after visits with the mother. DHS made reasonable efforts throughout the life of the case. Any requests for additional efforts just prior to the termination hearing were addressed appropriately by DHS.

**Guardianship as a Permanency Option**

Lastly, the mother asserts the district court erred in denying the mother's request for establishing a guardianship rather than termination. Although a guardianship may provide some permanency, it does not necessarily provide stability for the child. "So long as a parent's rights remain intact, the parent can challenge the guardianship and seek return of the child to the parent's custody." *In re R.S.R.*, No. 10-1858, 2011 WL 441680, at *4 (Iowa Ct. App. Feb. 9, 2011).

Termination and adoption are the preferred solution when a parent is unable to regain custody within the time frames of chapter 232. *See In re C.K.*, 558 N.W.2d 170, 174 (Iowa 1997) ("An appropriate determination to terminate a parent-child relationship is not to be countermanded by the ability and willingness of a family relative to take the child.").

H.V. needs permanency in his life, having been out of parental custody for over a year. The mother continues to have unaddressed substance-abuse issues because of her denial of use, even when confronted with positive tests. She continues to have contact with H.V.'s father, despite the history of domestic violence and his own unaddressed substance-abuse issues. Under these facts, a guardianship is not the preferred permanency option over termination.

**Conclusion**

Finding the juvenile court did not err in admitting all relevant and material evidence, the State met its burden to show that H.V. could not be returned to his mother's custody at the time of the termination hearing. Further, termination is in H.V.'s best interests, reasonable efforts were provided to the mother, guardianship is not a preferred permanency option for H.V., and a six-month extension was not warranted. For the above reasons, I respectfully dissent and would affirm the termination of parental rights pursuant to Iowa Code section 232.116(1)(f).